12 A.3d 671

**STATE of Maryland**

v.

**Fabian Andre SHIM.**

**No. 18, Sept. Term, 2010.**

Court of Appeals of Maryland.

Jan. 25, 2011.

38

Jessica V. Carter, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

Amy E. Brennan, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

This case involves two issues regarding the selection and instruction of the jury in a criminal murder trial. First, we must decide whether it is an abuse of discretion for the trial court to refuse to ask whether the venire panel harbored "such strong feelings concerning the violent death of another human being" that they would be "unable to render a fair and impartial verdict based solely on the evidence presented[.]"

Second, we must decide whether it is an abuse of discretion for the trial court to give a "flight" instruction to the jury when the evidence only shows that the perpetrator left the crime scene at some point after the murder. After the trial court refused the above question in voir dire, and gave the "flight" instruction, the defendant was convicted. On appeal, the Court of Special Appeals found that the trial court abused its discretion in both instances and reversed the conviction. We granted the State's Petition for a Writ of Certiorari to consider the following questions:

1. Did the Court of Special Appeals erroneously reverse the murder convictions because the trial court declined to ask prospective jurors, during *voir dire*, if any member of the jury panel had "such strong feelings concerning the violent death of another human being" that the member would be unable to render a fair and impartial verdict?

2. Did the [Court of Special Appeals] erroneously conclude that the trial court abused its discretion in propounding a flight instruction, based on evidence admitted at trial, and, if there was error, was the error harmless?

We shall answer these questions in the negative. We thus affirm the Court of Special Appeals' decision and remand to Circuit Court for a new trial.

## FACTS AND LEGAL PROCEEDINGS

Reina Tasha Lynch lived in Prince George's County with her two children. Fabian Andre Shim, the Respondent, is the father of Lynch's daughter. Lynch worked during the day as a school bus driver for Montgomery County Public Schools, and at night as a security guard at a Fed Ex facility in Beltsville, Maryland. Lynch had been seeking child support from Shim, and on November 1, 2006, both attended a pretrial settlement conference with the Maryland Child Support Enforcement Program. At the conference, the Child Support Program calculated Shim's suggested monthly child support obligation to be $590.17 per month. After the conference,

Shim told his then-fiancé, with whom he was living, that he was upset and felt that Lynch was "asking for too much money."

Nine days later, a man in a dark-colored BMW pulled up to the guard shack at the Fed Ex facility around 10:45 p.m., shortly before Lynch's night shift was to begin. Lynch's coworker approached the car and asked him what he was doing. The man, who looked to be between twenty-seven and thirty-three years old, stated that he was "having lunch." The man drove away shortly thereafter, before Lynch arrived. Lynch was the only security guard working the night shift on November 10. She logged tractor trailers into the facility at 12:01 a.m., 12:41 a.m., and 1:52 a.m. She logged a trailer out of the facility at 2:20 a.m. Shortly after 2:30 a.m., surveillance cameras showed a dark sedan pulling up to the guard shack, and leaving six minutes later. By the time the next truck came to the gate, the trucker got no answer from the guard shack and had to punch in a keycode to enter the facility.

Lynch's coworker came to relieve her at 6:30 a.m. He found the guard shack was locked and got no response from Lynch. At 7:20 a.m., the coworker called their boss and got the code to enter the shack. When he entered, he found Lynch lying on the floor in a pool of blood. Lynch had sustained two shotgun wounds, including one to her head from close range.

On the night Lynch was murdered, Shim got off work at 9:00 p.m. According to his former fiancé's son, Shim went home and changed from his work clothes. He left the house before 10:00 p.m. and did not return until around 3:00 a.m., telling his fiancé that he had worked late. He removed his clothes and placed them into a white plastic bag, saying that he had got something on them at work. He took a shower and then sat in a chair, holding his head and saying he didn't feel right.

The next day, Shim's fiancé learned that Lynch had been killed and mentioned it to Shim. He replied, "[W]hy did that bitch go and do that. Somebody had to kill her." Later that evening, Shim, angered with his fiancé, told her that if she

didn't do what he said, he would kill her "like he killed Tasha." Shim's fiancé left the house, met with Prince George's County police detectives, and never went back.

Police investigating Lynch's murder impounded two dark-colored, older model BMWs, including a blue BMW 735i, which they recovered on Holly Berry Court, where Shim had been living. Police recovered from the blue BMW a shotgun, a pair of black shoes, six rubber gloves, and identified Shim's fingerprints on the outside of the door and on a radio found inside the left front vehicle pocket. Police were unable to include or exclude Shim's DNA from the shotgun, which contained the genetic material of three unknown contributors. At trial, the owner of the blue BMW testified that he had lent Shim his vehicle so that Shim could do some body work. The owner further testified that he had not left the shotgun or any of the clothing in the car. Another witness, an acquaintance of Shim's, testified that Shim had owned a shotgun, and that Shim had called the witness a few days after the shooting and asked him to remove the shotgun from the BMW. The police arrested Shim and charged him with first degree murder.

Shim's counsel requested twenty-one *voir dire* questions, including "Question 18," which read as follows:

Does any member of the jury panel have such strong feelings concerning the violent death of another human being that you would be unable to render a fair and impartial verdict based solely on the evidence presented?

The court declined to ask Question 18, explaining that it was "not related to the overriding purpose and goal of voir dire in this case."

After the trial, during jury instructions, the Court gave a flight instruction as follows:

A person's flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence.

You must first decide wether there is evidence of flight. If you decide there is evidence of flight, then you must decide whether this flight shows a consciousness of guilt.

The trial court overruled Shim's counsel's objection to the flight instruction. The jury convicted Shim of first degree murder, and he timely appealed to the Court of Special Appeals.

The intermediate appellate court disagreed with the trial court's rulings with regard to both the voir dire question and the jury instruction. The Court first addressed the trial court's refusal to ask Shim's voir dire question:

> In the present case, Question 18 was directly related to the appellant's alleged criminal act. It was also reasonably likely to identify jurors with a bias so strong that it would impair their ability to be impartial. In addition, the trial court did not ask any other questions that adequately covered the matter contained in [the question]. We thus conclude that the trial court abused its discretion in declining to ask Question 18.

With regard to the flight instruction, the Court of Special Appeals examined the standards under which a flight instruction is appropriate, and concluded:

> In the case at hand, there was no evidence of flight. The rational inferences to be drawn from the evidence demonstrated only that the shooter left the Fed Ex facility after the shooting. There was no evidence that the shooter fled. The evidence that appellant took steps to avoid being apprehended did not amount to flight. As a result, the trial court abused its discretion in giving the flight instruction.

We granted certiorari to review these two issues. *State v. Shim,* 412 Md. 689, 990 A.2d 1046 (2010).

## DISCUSSION

*1. The Proposed Voir Dire Question*

We review the trial court's refusal to propound a requested voir dire question under our well-defined standards

for *voir dire*. *Voir dire* is the "primary mechanism through which the constitutional right to a fair and impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, is protected." *Curtin v. State*, 393 Md. 593, 600, 903 A.2d 922, 926 (2006). During this jury selection process, parties may disqualify a juror either for cause or by a peremptory strike. In *Curtin*, we explained the difference between these two challenges:

> **Peremptory challenges**[1] ... are challenges exercised without a reason stated, without inquiry, ... without being subject to the court's control and for either a real or imagined partiality that is less easily designated or demonstrable than that required for a challenge for cause.... Conversely, cause challenges permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality[.]

*Curtin*, 393 Md. at 601–602, 903 A.2d at 927–928 (2006) (quotation marks and some citations omitted) (emphasis added).

Maryland recognizes limited *voir dire*, which means parties can only ask questions related to a *cause challenge*. A party may thus propose questions designed to identify a juror's competency, impartiality, prejudice, or bias. *See Handy v. State*, 101 Md. 39, 43, 60 A. 452, 454 (1905). A party may not use voir dire to go "speculat[ing], [inquiring], catechizing, or 'fishing' " for information on which it will base its peremptory challenges. *Stewart v. State*, 399 Md. 146, 162, 923 A.2d 44, 53 (2007).

We allow the trial judge broad discretion in running *voir dire*. *Moore v. State*, 412 Md. 635, 644–46, 989 A.2d 1150, 1155–56 (2010). That discretion, however, is circumscribed by the defendant's "right to have questions propounded to pro-

---

1. The number of peremptory challenges afforded a litigant is governed by Section 8–301 of the Courts and Judicial Proceedings Article and Maryland Rule 4–313.

spective jurors on their voir dire, which are directed to a specific cause for disqualification[.]" *Moore,* 412 Md. at 644–46, 989 A.2d at 1155–56. A trial court, therefore, abuses its discretion when it refuses a question regarding "a specific cause for disqualification." *Id.* at 654, 989 A.2d at 1160. Specific causes for disqualification are biases directly related to (1) the defendant, (2) the witnesses, or (3) the crime. *See Dingle v. State,* 361 Md. 1, 10, 759 A.2d 819, 824 (2000). This Court has identified mandatory questions in each of these three areas.

First, we require questions regarding a juror's potential bias towards *the defendant. See Hernandez v. State,* 357 Md. 204, 232, 742 A.2d 952, 967 (1999) (whether jurors had bias towards criminal defendant's "race ethnicity, or cultural heritage."); *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 607, 143 A.2d 627, 632 (1958) (in a civil case involving a religious organization, whether jurors' religious beliefs would bias them against either party). *Cf. Landon v. Zorn,* 389 Md. 206, 222, 884 A.2d 142, 151 (2005) (not an abuse of discretion to refuse question regarding bias against a tort *plaintiff* ).

Second, we require the trial court to ask proposed questions regarding bias towards witnesses and certain types of evidence. *See Langley v. State,* 281 Md. 337, 378 A.2d 1338 (1977) (juror deference to police witnesses); *Bowie v. State,* 324 Md. 1, 595 A.2d 448, (1991) (bias against Defense's witnesses). *Cf. Corens v. State,* 185 Md. 561, 45 A.2d 340 (1946) (not error to ask question regarding bias towards circumstantial, as opposed to direct, evidence in capital case). *But see Stewart,* 399 Md. at 165–66, 923 A.2d at 55 (not mandatory to ask, *inter alia,* whether a prospective juror would give greater weight and consideration to the arguments of the assistant state's attorney than to those of defense counsel).

Third, and most relevant here, we have required in a series of cases that trial courts ask questions aimed at uncovering a juror's "strong feelings" towards *the crime charged.* In these cases, we have established limits to the trial judge's discretion regarding these questions, and they inform our result here today.

In *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002), we held that a trial court abused its discretion when it refused to ask whether the jury panel had strong feelings regarding *narcotics laws*. The defendant in *Thomas* proposed to ask the venire panel whether "any member of the jury panel [had] such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts . . . .", and the trial court refused. *Id.* at 204, 798 A.2d at 567. On appeal, we held that the question must be asked, reasoning that "it is common knowledge that a significant segment of our society believes, as a matter of public policy, that the criminal laws relating to marijuana should be modified in one way or another[.]" *Id.* at 211, 798 A.2d at 571. We explained further that "evidence that voir dire questions on drug attitudes are effective in revealing strong feelings towards narcotics laws that may hinder a juror's ability to serve." *Id.* at 212, 798 A.2d at 572.

Shortly after *Thomas,* we held that a trial court must ask a similar question regarding a *charge of sexual molestation* of a child. *See Sweet v. State,* 371 Md. 1, 806 A.2d 265 (2002). The defendant there unsuccessfully requested the trial court to ask whether "the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial. . . ." *Id.* at 9, 806 A.2d at 270–71. On appeal, we held that *Thomas* was controlling, and that the trial court abused its discretion in refusing to ask the "strong emotional feelings" question. To reach this conclusion, we interpreted the *Thomas* holding broadly, and did not engage in any "bias" analysis like that in *Thomas:*

> The Court's decision in petitioner's case is essentially controlled by our recent decision in *Thomas* [.] In that case, we held that it was an abuse of discretion for the trial court to refuse to ask the venire panel if any of them harbored "strong feelings regarding violations of the narcotics laws" in a trial in which the defendant was charged with possession and distribution of a controlled dangerous substance. **We reasoned that the inquiry was directed at**

biases, specifically those related to Thomas's alleged criminal act, that, if uncovered, would be disqualifying when they impaired the ability of the juror to be fair and impartial. The rationale of *Thomas* in this regard is fully applicable to the instant case. Accordingly, we hold that the trial court abused its discretion in failing to pose petitioner's requested voir dire question, and petitioner is entitled to a new trial.

*Id.* at 9–10, 806 A.2d at 271 (emphasis added) (some citations omitted). This passage demonstrates that after *Thomas,* this Court apparently did not believe it necessary to compare and contrast individual crimes to determine which could create disqualifying biases.

In a third case, we held that a question directed at biases towards "handguns" was not mandatory, thus distinguishing it from *Thomas* and *Sweet. See Curtin,* 393 Md. at 600, 903 A.2d at 926. In *Curtin,* the defendant was alleged to have participated in an armed bank robbery, and charged with robbery and assault. During *voir dire,* the defendant unsuccessfully requested the following voir dire question: "Does anyone have any strong feelings concerning the use of handguns that they would be unable to render a fair and impartial verdict based on the evidence?" *Id.* at 597, 903 A.2d at 925. We held that the trial court's refusal of this question was permissible, distinguishing the case from *Thomas* and *Sweet:*

Although Mr. Curtin alleges that his requested voir dire question comes within the strictures of *Thomas* and *Sweet,* we recognized in those cases that the charges of narcotics possession and child molestation in and of themselves could evoke strong feelings that could unduly bias a venireman. In the present case, however, Mr. Curtin was charged with armed robbery, use of a handgun in the commission of a crime of violence, first degree assault and conspiracy. We believe that ... Mr. Curtin's voir dire question was not mandated in this case merely because a handgun was used[.]

*Id.* at 610, 903 A.2d at 932–33.

Our holding in *Curtin* raised the question of whether we had narrowed *Thomas* and *Sweet* and embarked on a crime-

by-crime approach to mandatory questions. Indeed, the majority opinion sparked a concurrence and a dissent, both of which expressed concern that *Curtin* signaled a new approach. In a concurring opinion, Judge Wilner wrote:

It is obviously not reasonable to presume that [child sexual abuse and narcotics violations] are the *only* kinds of crimes about which public emotion may run high. Surely, there are others. Having found that those kinds of criminal activity may so enrage prospective jurors as to require specific voir dire questions to ferret out possible bias, what standard will the Court use to distinguish one crime from another?

We have essentially taken judicial notice that some people may have particularly strong feelings about narcotics crimes. Is it not equally likely that some will have the same strong feelings about other crimes—burglary, robbery, rape, arson, not to mention murder. Some may be incensed over gambling or prostitution, or wanton, vicious assault, or cruelty to animals, or fraud. If the question is phrased as here—whether the prospective juror has such strong feelings about the crime as to make it difficult (or impossible) to weigh the facts fairly—what difference does it make what the crime is?

*Curtin,* 393 Md. at 614, 903 A.2d at 934–35. (Wilner, J., concurring).

Similarly, in dissent, Chief Judge Bell, joined by Judge Raker, urged the Court to adopt a mandatory question for all charged crimes:

There is a lot to be said for Judge Wilner's concurrence in this case. It makes the point, and quite well, that this Court already has required voir dire questions designed to ferret out bias, arising from and/or based on certain charged offenses, that, in that regard, this Court already has embarked on and endorsed, an approach different from that espoused and touted as the approach our existing case law supports. Acknowledging our decisions in *Thomas* and *Sweet,* he recognizes the unreasonableness in presuming

that the crimes at issue in those cases "are the only kinds of crimes about which public emotion may run high." In addition, Judge Wilner concedes that the additional voir dire required to inquire into charged crime bias is not likely to be lengthy or cause undue trial delay.

* * *

We already have decided and agreed that certain crimes—we have specifically singled out child sexual offenses and narcotic offenses—may trigger sufficiently strong reactions in potential jurors as to make questionable their ability to render a fair and impartial verdict. If, in narcotics and child sex abuse cases, inquiry of the venire is required because we have determined those crimes to evoke strong emotional reactions which may amount to bias, why do we not recognize that there are other crimes that may evoke the same or more extreme reactions. It is unconscionable that we would inquire in some cases, those we have specifically recognized, but refuse to do so in those other cases, simply because it might take too long and perhaps because it may be too difficult to decide which cases fall into the *Thomas* and *Sweet* category. Under that regime, the Court is allowing two categories of cases to be targeted, while allowing the vast majority to go unchecked for possible bias. The answer is clear; we must require, as a matter of policy, trial courts to ask, in every criminal trial, whether the prospective juror has such strong feelings about the charged crime as to make it difficult or impossible to weigh the facts fairly.

*Curtin,* 393 Md. at 616–19, 903 A.2d at 935–38. (Bell, C.J., dissenting) (citations omitted). This array of opinions has understandably led some to believe that we have engaged in a crime-by-crime approach to mandatory *voir dire* questions. *See, e.g., Sanders v. State,* 194 Md.App. 162, 177, 4 A.3d 1, 9–10 (2010) (stating that the *Curtin* majority, in declining to adopt Chief Judge Bell's suggestion of a mandatory question in all cases, embraced an approach which distinguishes among crimes). Here, the State has adopted this interpretation, and

argued that we should not "extend" the holdings of *Thomas* and *Sweet* to the crime of murder, or "violent death."

A close reading of *Curtin,* however, demonstrates that the majority did not go so far as to embrace such an approach. To be sure, in the short passage quoted above, the *Curtin* Court suggested that it would rely on the inherent differences between the charged crimes at issue and those of *Thomas* and *Sweet.* Immediately after this passage, however, the Court amplified its reasoning. Adopting the approach of the intermediate appellate court, *see Curtin v. State,* 165 Md.App. 60, 884 A.2d 758 (2005), this Court explained:

> Appellant's defenses were based on theories suggesting that appellant was not a participant in the bank robbery or, alternatively, that there was no evidence that a real gun was in fact used.

> \* \* \*

> In this case ... potential juror bias about handguns **does not go so directly to the nature of the crime.** Appellant was accused of robbing a bank with an accomplice who was brandishing a gun.... **[N]o analysis or weighing of issues pertaining to the gun was required** by jurors in this case, other than accepting or rejecting the State's evidence demonstrating that a gun was used in the commission of the crime. The proposition that a juror's strong feelings for or against handguns would necessarily preclude him or her from fairly weighing the evidence in this case—where there was clearly no question relating to the "reasonableness" or "justifiableness" of the use of the gun under the circumstances—is based upon a transcendental line of reasoning with which we disagree.

> \* \* \*

> Given the nature of the charges against appellant, a juror who had strong feelings for or against handguns **could nonetheless be fair and impartial.** Additionally, after balancing the judicial interest of probing into the likelihood of uncovering disqualifying juror partiality or bias with the interests of judicial efficiency and preservation of a court's

limited resources, we are troubled by the precedential consequences of ... effectively requir[ing] a court to ask whether any prospective juror has "strong feelings on handguns" in every case in which the jury will receive evidence that a handgun was used in the commission of a crime. *Curtin*, 393 Md. at 611–12, 903 A.2d at 933. We held that the "proposed voir dire question did not directly address a juror's ability to weigh the issues fairly or render an impartial verdict in this case." *Id.* at 612, 903 A.2d at 933 (quoting *Curtin v. State*, 165 Md.App. 60, 68, 884 A.2d 758, 763–764 (2005)). The *Curtin* court, therefore, was more concerned with the collateral nature of the handgun issue in that case than with any fundamental differences between the charged crimes.

The majority, moreover, explicitly acknowledged that a "strong feelings" question could be appropriate in **other cases involving handguns,** citing favorably and repeatedly to *Baker v. State,* a Court of Specials Appeals case which held that a handguns instruction was required. *See Baker v. State,* 157 Md.App. 600, 613, 853 A.2d 796, 803 (2004) (where criminal defendant argued that he shot victim in self defense, meaning that the jury might have to decide whether appellant used reasonable force; thus, the "trial court should have asked whether any prospective juror had strong feelings about handguns that would have affected his or her ability to weigh the issues fairly.")

Additionally, since *Curtin,* we have signaled an intent to treat all criminal charges the same during *voir dire. See Stewart,* 399 Md. 146, 923 A.2d 44. In *Stewart,* we dealt with a court's refusal to ask a *voir dire* question as to whether the jury would give undue weight to the Assistant State's Attorney's arguments. In holding that this question was not mandatory, we also opined that crime-specific questions should be asked:

Although we conclude that the trial judge did not abuse his discretion in declining to ask the proposed voir dire questions, we think it sound practice, and one trial judges should follow, to ask prospective jurors, when asked to do

so, whether the fact that the defendant is charged with a particular crime would affect their ability to be fair and impartial in the case or whether they have such strong feelings about the crime charged that they could not be fair and impartial and decide the case based solely on the evidence presented. In the case before us, defense counsel did not request such an instruction.

*Id.* at 167 n. 6, 923 A.2d at 56 n. 6. In this passage we implicitly recognized that any crime could give rise to a disqualifying bias in a prospective juror, our holding in *Curtin* notwithstanding.

*Curtin*, therefore, is more properly understood as a reminder that a proposed voir dire question must be aimed at uncovering biases **directly related** to the crime, the witnesses, or the defendant. Indeed, this is how we recently characterized our opinion in *Curtin*, rejecting a broader interpretation forwarded by the State:

If a response to a requested voir dire question would not further the goal of *voir dire* and uncover bias among prospective members of the jury, it need not be asked and the court will not abuse its discretion in not doing so.

*Curtin* is illustrative.... The [*Curtin*] Court [ ] distinguished that question from other questions which were included during the voir dire which "adequately addressed any potential issues of bias regarding the nature of armed robbery." *Curtin*, therefore, focused on whether the requested *voir dire* question would assist in the pursuit of uncovering bias and, in that way, assist the court and counsel in selecting an unbiased jury.

*Moore*, 412 Md. at 662–63, 989 A.2d at 1165–66. (citations omitted). This discussion in *Moore* clarified that the *Curtin* question was not required because bias regarding armed robbery—a disqualifying bias—was adequately addressed. Any juror bias towards handguns, a collateral issue in the case, was not a disqualifying bias given the nature of the issues in that case. *See also Costley v. State*, 175 Md.App. 90, 926 A.2d 769 (2007) (when defendant was charged with mur-

dering his mother-in-law, trial court not required to ask the jury questions about divorce or in-law problems). *Curtin* should therefore be limited to its facts.

Our holding in *Moore* provides additional guidance, as that case resolved a similar dispute over the classes of witnesses that deserved a *voir dire* question. *See Moore*, 412 Md. 635, 989 A.2d 1150. In the line of *voir dire* cases involving bias towards certain witnesses, our initial decision came in *Langley*, 281 Md. 337, 378 A.2d 1338. In *Langley*, we addressed whether the following *voir dire* question was required: "Is there anyone here who would give more credit to the testimony of a **police officer** over that of a civilian, merely because of this status as a police officer?" *Id.* at 338, 378 A.2d at 1338 (emphasis added). We held that question was mandatory, and that it was reversible error for the trial court to have refused it.

After our holding in *Langley*, much like in the cases following *Thomas*, we were asked to consider whether *Langley* applied broadly to questions regarding all of the State's witnesses, or whether it was a narrow holding addressed only at police officers. *See Moore*, 412 Md. at 635, 989 A.2d at 1150. In *Moore*, we considered the more general "Defense–Witness" question:

"Would any prospective juror tend to view the testimony of a witness called by the defense with more skepticism than witnesses called by the State, merely because they were called by the defense?"

*Id.* at 642, 989 A.2d at 1153. The State sought to limit the holding in *Langley* to apply only to police officers, reasoning that the Defense–Witness question was not a mandatory inquiry because previous cases listing mandatory *voir dire* questions had not expressly mentioned this question. *Id.* at 655–656, 989 A.2d at 1161. In responding to the State's argument, we first acknowledged that, "[a]t first glance the holding in *Langley* may be viewed, and interpreted as, limited to witnesses who are police officers." *Id.* at 645, 989 A.2d at 1155.

We then examined the cases cited in *Langley*, and their more broad propositions, and held:

> [I]t is apparent that the *Langley* Court, from the outset, understood that, although it was addressing police officer credibility and, thus, some of the cases were not directly on point, the underlying issue of prejudgment encompassed more than police officers, that many more occupations and categories potentially were implicated. To be sure, it was the nature of the issue and who the witnesses were that would determine which questions, about which occupations and categories, had to be asked to uncover prejudicial or disqualifying bias.

*Id.* at 649, 989 A.2d at 1158. We thus stated, "[t]he principles prescribed and enunciated by Langley and embodied in its holding cannot be, as we have seen, so narrowly interpreted or applied to police officers." *Id. See also Bowie*, 324 Md. 1, 595 A.2d 448 (interpreting *Langley* to require a Defense–Witness question).

In this case, the State has similarly suggested that we adopt a narrow interpretation of our *voir dire* principles, and limit our precedents to their specific factual circumstances. As in *Moore*, we decline to do so. The State's approach fails to see the "forest" of our *voir dire* principles for the "trees" that are the factual circumstances of our initial decisions.

 Therefore, to the extent that this Court has not already done so, we recognize today that the potential for bias exists in most crimes, and thus we will require *voir dire* questions which are targeted at uncovering these biases. When requested by a defendant, and regardless of the crime, the court should ask the general question, "Does any member of the jury panel have such strong feelings about [the charges in this case] that it would be difficult for you to fairly and impartially weigh the facts." This is a question targeted at uncovering a bias directly related to a crime, even if "[t]he question does not involve any of the mandatory areas of inquiry that this Court has already identified." This holding is not a departure from a previous cases, but an approach "on

which we have already embarked." *Curtin,* 393 Md. at 613, 903 A.2d at 934. (Wilner, J., concurring).

If a charge-specific question is generally required when proposed, the final issue here is whether the Shim's question is distinguishable from this general question, because he used the phrasing "violent death of another human being," and not "murder" or "the criminal charges in this case." The State argues that this phrasing is too broad, it is not directed enough to the murder charges in this case, but instead could uncover a spectrum of biases regarding other violent deaths, such as suicides and military deaths, that would not be disqualifying biases.

We disagree. While "violent death" and "murder" are not perfectly synonymous, they are close enough. Here, the violent death of the victim, a mother of two, working two jobs, is the central event and only issue. A jury member with exceedingly strong feelings regarding "violent death" may be unable to render a fair and impartial verdict, and be subject to disqualification. The defendant is thus entitled to inquire into this potential bias.

 To hold differently, moreover, would make *voir dire* an exercise in semantics and a minefield for criminal defendants and the State. We decline to make such fine distinctions or create more uncertainty. A proposed *voir dire* question need not be in perfect form, and the court is free to modify the proposed question as needed. *See Casey,* 217 Md. at 606, 143 A.2d at 631 ("We do not say, or even intend to intimate, that the court was required to propound the precise questions submitted. The form of the questions to be asked is clearly within the sound discretion of the court."). *Cf. Gunning v. State,* 347 Md. 332, 350, 701 A.2d 374, 382–83 (1997) ("It should ... be noted that a trial judge is under no obligation to use the precise language suggested by counsel in submitting [a jury] instruction. The fact that counsel's formulation accurately states the law does not preclude the court from fashioning its own instruction, provided that the judicially-crafted instruction is accurate and 'fairly covers' the re-

quested instruction."); *Bentley v. Carroll,* 355 Md. 312, 329 n. 10, 734 A.2d 697, 706 n. 10 (1999) ("[T]he particular jury instructions requested by Appellant probably should not have been given in the form presented; rather, the court should have crafted its own instructions adequately addressing the issues raised by Appellant that were appropriate for the jury's consideration.")

More generally, a trial court should follow Judge Murphy's suggestion that it "resolve a 'doubtful' and/or 'marginal' voir dire question in favor of the party who has requested that it be asked." Judge Murphy has further suggested, in two concurrences, that trial courts can avoid later problems with a simplified inquiry, in which the trial court should ask itself "does this question probe for a condition that would be likely to impair a juror's ability to decide this case on the evidence presented?" *Curtin,* 165 Md.App. at 78, 884 A.2d at 769, *aff'd,* 393 Md. 593, 903 A.2d 922 (2006) (Murphy, C.J., concurring), *Moore,* 412 Md. at 670, 989 A.2d at 1169 (Murphy, J., concurring). If the answer to that question is "yes," states Judge Murphy, the question should be asked.

### 2. The Flight Instruction

The second issue we must consider here is whether the trial court abused its discretion by giving an instruction to the jury regarding the flight by the defendant. The State argues that "there was an abundance of evidence that Shim took steps to avoid apprehension," including driving a borrowed car, wearing gloves, lying about his whereabouts, and asking a friend to remove a shotgun from his car. This evidence, the State argues, was sufficient to generate a flight instruction, or in the alternative, was a harmless error.[2]

---

2. The State explains that the flight instruction was taken verbatim from the pattern instructions for flight *and concealment. See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 3:24 at 82 (1997). The pattern instructions include the term "concealment" in brackets next to every instance of the word "flight." The State argues that "had the court substituted 'concealment,' instead of 'flight' in the instruction, Shim apparently would have had no cause to object to the

Shim argues that the evidence was insufficient to show "flight," because it merely shows that "someone drove into the Fed Ex facility, entered the guard shack, shot Lynch, and left." Shim states that "there was no evidence that the car left the facility at a high rate of speed or that the police had pursued him in a fleeing vehicle." Instead, Shim "returned to his home and continued his routine until he was placed under arrest."

We addressed when a flight instruction should be given in *Thompson v. State,* 393 Md. 291, 901 A.2d 208 (2006). In that case, three men were robbed, and one man shot, in Baltimore's Inner Harbor by two unknown perpetrators. Police investigating the crime saw the defendant, who fit the description of one of the perpetrators. A police officer approached the defendant, who attempted to flee. The defendant was subsequently arrested and charged with robbery and attempted murder. At the close of the case, the trial court gave an identical instruction to the instruction at issue here. Defendant appealed, arguing that he had fled because he was in possession of the drugs, and the trial court erred in giving the instruction because it falsely assumed a connection between defendant's flight and guilt for the more serious crimes of robbery and attempted murder.[3] We granted *certiorari,* and explained our standards for when a flight instruction is appropriate:

In *Thomas v. State,* 372 Md. 342, 812 A.2d 1050 (2002), we adopted the four-prong test set forth by the United States Court of Appeals for the Fifth Circuit in *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977), with respect to the probative value of evidence indicating consciousness of guilt and the rubric for assessing the propriety of jury instructions based on such evidence.

---

instruction." The State encourages this Court to interpret "flight" broadly, so as to include "flight from justice" and thus "concealment."

**3.** The defendant was not charged with drug possession. The drugs recovered were suppressed.

In Myers, ... [t]he United States Court of Appeals for the Fifth Circuit concluded that the probative value of flight evidence as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. Moreover, the Court held that "a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences."

We agree with those jurisdictions which have determined that a flight instruction should not be given unless the four inferences explicated in Myers reasonably may be drawn. Therefore, for an instruction on flight to be given properly, the following four inferences must reasonably be able to be drawn from the facts of the case as ultimately tried: that the behavior of the defendant suggests flight; that the flight suggests a consciousness of guilt; that the consciousness of guilt is related to the crime charged or a closely related crime; and that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime.

*Thompson*, 393 Md. at 311–12, 901 A.2d at 220 (some citations omitted). In *Thompson*, we found that the third inference—that the consciousness of guilt is related to the crime charged—could not be reasonably drawn due to the defendant's drug possession. We thus found that the flight instruction was improperly given.

In another case, the intermediate appellate court clarified the distinction between flight and departure:

The term flight is often misused for the word "departure." Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt. 'Flight' may be established by a broad range of circumstances. We believe the proper rule to be that for departure to take on the legal significance of flight, there must be

circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.

*Hoerauf v. State,* 178 Md.App. 292, 324–25, 941 A.2d 1161, 1179 (2008) (emphasis deleted). The Court of Special Appeals in this case held that the trial court erred in giving a flight instruction when the evidence only showed departure.

In this case, the Court of Special Appeals agreed with *Shim* that the first inference—that the behavior of the defendant suggests flight—had not been met:

> In the case at hand, there was no evidence of flight. The rational inferences to be drawn from the evidence demonstrated only that the shooter left the Fed Ex facility after the shooting. There was no evidence that the shooter fled. The evidence that appellant took steps to avoid being apprehended did not amount to flight. As a result, the trial court abused its discretion in giving the flight instruction.

We consider the intermediate appellate court's decision sound, and agree that the "flight" instruction should not have been given in this case.

## CONCLUSION

The trial court abused its discretion when it refused to give Shim's proposed question. We generally require a question asking whether any member of the venire panel has such "strong feelings about the charged crime as to make it difficult or impossible to weigh the facts fairly," and the question here is the functional equivalent of that question. The trial court also abused its discretion in giving a flight instruction when the evidence only showed a departure from the crime scene.

**COURT OF SPECIAL APPEALS AFFIRMED. JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR NEW TRIAL. COSTS IN THIS**

COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.

HARRELL, J., concurs.

HARRELL, J., concurring.

I concur with the Majority opinion. I write separately out of self-indulgence and to purge my conscience. During my time on the Court, my views have come full circle on the general issue of whether a trial court should be required to ask a voir dire question, if requested to do so, whether the prospective jurors in a criminal case "have such strong feelings concerning (*insert nature of pertinent crime charged*) that they would be unable to render a fair and impartial verdict." In its first manifestation after I joined the Court, *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002) (narcotics offense), I joined Judge Raker's concurring opinion, 369 Md. at 217–19, 798 A.2d at 575–76, which expressed the view that, assuming a trend of case-by-case consideration of such inquiries, a blurring will occur eventually between the acquisition of information in aid of for-cause strikes and peremptory strikes, with a concomitant limiting of the discretion of trial judges in the control of voir dire. *Id.* To avoid repetitive litigation necessitated by a case-by-case approach, Judge Raker and I endorsed generally "a voir dire process that would enable a lawyer to elicit sufficient information to develop a rational basis for excluding a potential juror, whether for cause or by peremptory challenges." *Id.* at 218–19, 798 A.2d at 575–76.

Next came *Sweet v. State*, 371 Md. 1, 806 A.2d 265 (2002) (child molestation), where I stood again with Judge Raker (writing for the Majority) to require a like form of question. *Id.* at 9–10, 806 A.2d at 270–71.

Departing from my previous jurisprudential policy position, I veered in another direction in *Curtin v. State*, 393 Md. 593, 903 A.2d 922 (2006) (use of handgun), joining the Majority opinion justifying denial of a voir dire request for a question, in a trial involving, among other charges, multiple counts of robbery with a deadly weapon and use of a handgun in the

commission of a crime of violence, regarding "strong feelings concerning the use of handguns." *Id.* at 596–97, 903 A.2d at 924–25. In hindsight, it seems that handgun use is nearly as likely to inspire potential strong feelings among law-abiding venire persons as narcotics and child molestation. I in no way here purport to re-imagine or critique the reasoning of the Majority opinion in *Curtin* so as to evade for myself the question of whether I, for one, was consistent there with the prior views I associated myself with in Judge Raker's concurrence in *Thomas* and her Majority opinion in *Sweet.* Suffice it to say that perhaps I was moved to join the Majority in *Curtin* because the inexorable case-by-case march feared in the *Thomas* concurrence was coming to pass, and I thought to erect a stop sign of sorts to discourage future cases. That failed obviously. At this point in time, I am content to abide Judge Adkins's rationalizations (Maj. op. at 49-53, 12 A.3d at 678-80) in the opinion in Shim's case that *Curtin* "should . . . be limited to its facts." *Id.* at 16, 806 A.2d 265.