74 A.3d 765

**John WAGNER**

v.

**STATE of Maryland.**

**No. 2129, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 4, 2013.

420

426

Brian L. Zavin (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: WOODWARD, GRAEFF, IRMA S. RAKER (Retired, Specially Assigned), JJ.

GRAEFF, J.

After an eight-day trial, a jury sitting in the Circuit Court for Baltimore City convicted John Wagner, appellant, of first degree felony murder, armed robbery, and conspiracy to commit armed robbery. The court imposed a sentence of life imprisonment for the felony murder conviction and a consecutive sentence of twenty years for the conspiracy conviction.[1]

On appeal, appellant presents seven questions for our review, which we have rephrased slightly as follows:

1. Did the trial court err by refusing to ask appellant's requested voir dire question?

2. Must appellant's convictions be reversed as a result of the introduction of other crimes evidence?

3. Did the trial court err in admitting evidence that appellant called out his girlfriend's name while in custody, and thereafter in refusing to allow appellant to introduce evidence to explain his action?

4. Did the trial court err in restricting appellant's ability to cross-examine a witness regarding her eligibility for parole?

5. Did the trial court err in admitting hearsay evidence?

6. Did the trial court err in refusing to tailor its flight and concealment of evidence instructions to both sides' theories of the case?

7. Did the trial court err in denying appellant's request to appear without shackles during the announcement of the verdict and polling of the jury?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

---

1. The court merged for sentencing purposes the conviction for armed robbery with the conviction for felony murder.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 25, 2010, at approximately 11:00 p.m., Stephen Pitcairn arrived at Penn Station in Baltimore City. He was returning from a trip to New York, where he celebrated his 24th birthday with his sisters.

While Mr. Pitcairn was walking from the station to his apartment, located in the Charles Village section of Baltimore City, he was attacked and robbed by two individuals. Less than an hour later, at 12:05 a.m. on July 26, 2010, Mr. Pitcairn died due to a stab wound to his chest.

When Mr. Pitcairn arrived at the train station at approximately 11:00 p.m., he called his mother, Gwen Pitcairn, to let her know that he was back in Baltimore. He said he was going to walk home from the station, which he estimated to be a 15–20 minute walk. Mr. Pitcairn asked his mother to talk to him on his cell phone until he got home, stating: "I always feel so safe when you're on the phone with me."

Mr. Pitcairn was telling Ms. Pitcairn about his weekend with his sisters when Ms. Pitcairn heard "a lot of noise and commotion." She heard Mr. Pitcairn state that he did not have any money, and he said: "Here, take my wallet." Ms. Pitcairn heard a man say "shut up" twice. She then heard "something [that] sounded like [Mr. Pitcairn] got punched" and "shuffling" sounds. Someone then disconnected the call from Mr. Pitcairn's phone.

Ms. Pitcairn, who was at her home in Florida, called 411 and was connected to 911 in Baltimore. By the time she spoke with the 911 operator, the Baltimore police already were aware that there had been an incident. At 2:45 a.m. on July 26, 2010, Ms. Pitcairn learned that Mr. Pitcairn had been killed.

Prior to the assault, Reggie Higgins was at his home on St. Paul Street. He heard loud noises outside, looked out of his second-floor window, and saw three people scuffling on the sidewalk in front of his home. Mr. Higgins observed a thin white male who was approximately six feet tall, whom he later

learned was Mr. Pitcairn, backing away from two black individuals, both of whom Mr. Higgins believed were men. One of the individuals had braided hair or twists, and the other had short hair.

Mr. Pitcairn yelled: "[H]elp," and Mr. Higgins ran down the stairs to his first-floor window to get a better view. He saw the two individuals tussling with Mr. Pitcairn, and he went to get his keys to go outside. When he looked back out the window, he saw Mr. Pitcairn on the ground. The assailant with short hair was leaning over Mr. Pitcairn, and the other was holding something, which appeared to be a wallet. Mr. Higgins used his keys to open his security door and yelled: "Hey!" By that time, however, the two assailants were gone.

Mr. Higgins ran to Mr. Pitcairn, saw that he was badly injured, and ran back inside to call 911. When he returned, he told Mr. Pitcairn that the police and an ambulance were on the way. Mr. Pitcairn kept struggling to speak, but the only word Mr. Higgins could make out was: "Mom."

Officer Michael Harren, a police officer with the Baltimore City Police Department, responded to Mr. Higgins' address at 11:25 p.m. He saw Mr. Higgins holding and comforting Mr. Pitcairn. Mr. Pitcairn was alive, but he was not very responsive. Medics arrived at the scene three to four minutes later and rushed Mr. Pitcairn to Johns Hopkins Hospital. Forty minutes later, Officer Harren learned that Mr. Pitcairn had died at the hospital.

Mr. Higgins told the police that Mr. Pitcairn was attacked by two men. He believed that both assailants were men: (1) because he assumed that a woman would not be involved in that kind of activity; and (2) based on their build and stature. Both assailants were shorter than six feet tall and slightly built. Due to the low light, he was unable to get a close look at their faces, but he could tell that they both had medium complexions. Mr. Higgins observed that the attacker with the short hair was wearing blue jeans and a white or light gray T-shirt. He was not sure about the color of the attacker's

clothing, however, as he is "a little colorblind" and has trouble seeing certain colors.

Mr. Higgins believed that the assailants had run south, down St. Paul Street. Police investigators later obtained video footage from the intersection of Charles Street and 26th Street that showed two people running westbound on 26th Street, between St. Paul and Charles Streets, at 11:22 p.m.

At approximately 11:50 p.m., Gregory Boris, the lead detective in the investigation of Mr. Pitcairn's murder, arrived at Mr. Higgins' address. The crime scene, which took up a small portion of the sidewalk, consisted of Mr. Pitcairn's "red and black gym bag, a flip-flop" and a pool of blood. After returning to the Baltimore Police Department Homicide Unit, Detective Boris called Ms. Pitcairn, who advised that her son had offered his iPhone and brown leather wallet to the assailants.

In response to the murder, Officer Kevin Ege was assigned to patrol the area. At 2:54 a.m. on July 26, 2010, as Officer Ege was driving north on Charles Street approaching 25th Street, he saw two individuals talking animatedly and gesturing abruptly. As he got closer, one of the two, Tyrene Williams, flagged him down. The person with Ms. Williams, a black male wearing dark-colored shorts and a white t-shirt, ran away as Officer Ege approached.[2] Ms. Williams pointed to the man and said: "[Y]ou're looking for him for the robbery at the gas station tonight." Officer Ege believed that Ms. Williams' comment was related to Mr. Pitcairn's robbery and murder. He detained Ms. Williams and tried to follow the man who had been with her, but he was unable to locate the man. Officer Ege took Ms. Williams to the Homicide Unit; she arrived at the police station at 3:04 a.m.

At 4:00 a.m., Detective Boris was notified that Officer Ege had located a possible witness to Mr. Pitcairn's murder. He

---

2. On direct examination, Officer Ege testified that the man walked away. In response to questioning on cross-examination, however, he stated that the man ran.

interviewed Ms. Williams, who gave a taped statement to the police at 4:27 a.m., stating that appellant robbed a white man, hurt him, and took his credit card. Ms. Williams advised that she had gone to a gas station as part of a scheme to use Mr. Pitcairn's credit card to buy gas for people in exchange for money. Based on information from Ms. Williams, the police obtained a search and seizure warrant for the second floor apartment at 2607 Maryland Avenue, where Ms. Williams lived with a number of other individuals, including appellant.

At 5:52 a.m., before the search warrant was executed, a police officer located Kevin Cosby. He was walking on the 2400 block of Charles Street, and the officer flashed his lights and told Mr. Cosby to stop. In response to the officer's question regarding a murder, Mr. Cosby told him that he did not know anything about anyone getting killed. The officer took Mr. Cosby to the Homicide Unit, where he was immediately placed in a holding cell. Mr. Cosby was wearing a white tank top, checkered shorts, white tennis shoes with green stripes, and a white baseball cap.

Detective Boris interviewed Mr. Cosby at the police station. After receiving his *Miranda*[3] rights, Mr. Cosby agreed to speak with the police about his actions the night of July 25, 2010. Mr. Cosby stated that appellant advised that he "beat a man to death," and Mr. Cosby then used the victim's credit card to get money. Mr. Cosby told Detective Boris the location of Mr. Pitcairn's credit card, he went with Detective Boris to a location several blocks from appellant's apartment, and he pointed out where the credit card was concealed. Detective Boris found the card hidden in a wall, wrapped in a Powerball ticket.

At 7:10 a.m., a SWAT team executed the search warrant for appellant's apartment. Detective Boris arrived at the residence after all the individuals present had been secured in the kitchen. These individuals, including appellant, appellant's

---

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

girlfriend Lavelva Merritt, Howard Michael Martin, Earlene Thomas, Tameka Quashie, Rodney Brown, as well as Rodney Brown's infant son, were then transported from the residence to the Homicide Unit.

When Detective Boris arrived at the residence, he noticed what appeared to be blood smudges on the door. After the arrival of the crime lab, Detective Boris began searching the apartment for evidence related to the murder. In the front bedroom, Detective Boris noticed a LeBron James jersey that was draped over the back of a chair. The jersey appeared to be damp and cool, indicating that it could have been washed recently. Underneath the jersey was a pair of blue jean shorts, which Detective Boris placed on top of the jersey.[4] Detective Boris also observed under the chair a pair of white tennis shoes, which appeared to have been worn recently and had possible blood stains. He recovered a cell phone from inside one of the shoes.

On a shelf in the bedroom, in plain view, Detective Boris saw the card insert portion of a brown leather Coach wallet, which Ms. Pitcairn later identified as a portion of Mr. Pitcairn's wallet. He asked the crime scene technician to photograph and recover the wallet insert.

In addition to the other clothing items, the police also recovered a white hat that appeared to have blood on the brim, along with a second pair of white tennis shoes inside of a milk crate on the floor of the room. Detective Boris discovered a black folding knife inside the left shoe, and Mr. Pitcairn's iPhone in the right shoe. Under a bed in the room, he found three other knives, two sharpened screwdrivers, a brown or maroon wallet, and several cell phones.

---

4. At appellant's trial, Detective Boris testified that he was not aware "that if you place one object upon another object, it can transfer DNA from one object to another." William Sloane, the Baltimore City Police Department Criminal Technician who processed the evidence obtained from 2607 Maryland Avenue testified that, by placing the shorts on top of the jersey, Detective Boris had created a risk that trace evidence could be transferred between the items.

On July 27, 2010, appellant was charged with first degree murder, second degree murder, armed robbery, robbery, first degree assault, second degree assault, theft, conspiracy to commit murder, and conspiracy to commit armed robbery. Five of the residents of 2607 Maryland Avenue testified at appellant's trial as witnesses for the State, including Ms. Merritt, who was charged with the same crimes as appellant for her role in Mr. Pitcairn's death.

Ms. Merritt testified that, prior to July 25, 2010, she had been living at 2607 Maryland Avenue with appellant, her boyfriend; her mother, Ms. Thomas; her mother's boyfriend, Mr. Martin; her cousin, Mr. Cosby; and Ms. Williams, for a few weeks.[5] She and appellant, whom she also called "Ya–Ya," had been dating for two years and they had a good relationship. At that time, she was using "a lot of drugs," including heroin and cocaine.

On July 25, 2010, Ms. Merritt was at home during the day; she had not used any drugs. That evening, Ms. Merritt and appellant left the apartment because appellant said he "wanted some money." Ms. Merritt understood appellant to mean that he "wanted to rob somebody." She agreed to go with him to find someone to rob, and they left, without having any particular destination. Ms. Merritt did not bring a weapon with her, but appellant brought a "pocket knife." Ms. Merritt described appellant's clothing that day as khaki shorts, white Nike Airs, and a LeBron James jersey. She wore pink stretch pants, a grey shirt, and flip flops.

A couple hours later, they saw Ms. Williams and Mr. Cosby. Ms. Merritt, appellant, and Mr. Cosby talked about robbing people, and Ms. Williams listened. Mr. Cosby told the group that he previously had "robbed a white lady" and "had no problem with robbing anybody." They discussed profiling victims based on whether or not they looked like they had any

---

**5.** Although Mr. Cosby was Ms. Merritt's cousin, she grew up in foster care and did not know Mr. Cosby until she was older, and she was not close to him or to Ms. Williams.

money, and at the end of the conversation, the two couples went their separate ways, with no plans to meet up again.

Ms. Merritt and appellant went to a bar on St. Paul Street, near the train station, waiting for a victim. They noticed Mr. Pitcairn as he was leaving the train station. Appellant and Ms. Merritt looked at each other to signal that "he was our victim." They followed Mr. Pitcairn up the street, and when he reached a part of the street where Ms. Merritt and appellant thought no one would see them, Ms. Merritt and appellant grabbed him from behind. Mr. Pitcairn told them he did not have any money; he tried to back away as appellant held him with one hand and pulled the knife out with the other. Appellant attempted to close the knife while keeping his grip on Mr. Pitcairn, and as he swung Mr. Pitcairn around to get a better grip, he stabbed him with the knife.

Mr. Pitcairn fell to the ground and said: "[T]ake my wallet, I don't have [any] money." Once Mr. Pitcairn was on the ground, appellant took his wallet, and Ms. Merritt punched him in the head and took his phone. Ms. Merritt heard a female voice on the phone saying "hello, hello, hello," and then hanging up. Mr. Pitcairn's phone subsequently rang and displayed the name "dad," at which point Ms. Merritt turned the phone off.

After taking Mr. Pitcairn's wallet and phone, appellant and Ms. Merritt ran back to their apartment. Ms. Merritt did not realize that appellant had stabbed Mr. Pitcairn until she saw "a bunch of blood" on appellant's hands. Appellant told Ms. Merritt that he thought he hurt Mr. Pitcairn "really bad," and he had "never seen this much blood in my life." When they got to the apartment, appellant opened the front door, and they headed straight to the bathroom to take off appellant's jersey, shorts, and shoes, and to wash the knife. Ms. Merritt washed Mr. Pitcairn's blood off the knife, and appellant washed his jersey and shoes. Ms. Merritt and appellant also washed their hands. Appellant took off his khaki shorts and put them in a plastic bag, along with Mr. Pitcairn's wallet, and

tied the bag. Ms. Merritt told appellant to get rid of the jersey, but instead, he placed it on top of a chair in their room.

After cleaning up, Ms. Merritt and appellant went to the front bedroom. Appellant was upset over what happened with Mr. Pitcairn, and he began crying, stating: "[A]ll that over a phone, I didn't mean to do it" and "I think I stabbed him twice . . . that was a lot of blood." Ms. Merritt told appellant not to worry about it, that "he's going to make it." After Ms. Merritt and appellant talked about what had happened, they "got down to business" to try to figure out how they could get money. Ms. Merritt stated that she was "going to sell his phone tomorrow." Appellant suggested that they use Mr. Pitcairn's credit card to get money, but he stated that he did not know how to use a credit card to get cash.

While appellant and Ms. Merritt were talking in the bedroom, Ms. Williams and Mr. Cosby arrived. Appellant asked Ms. Merritt if she wanted to ask Mr. Cosby how to get cash from the credit card, but Ms. Merritt stated: "I don't trust [Mr. Cosby] like that." Appellant told them that "we just hurt this white boy pretty bad." He did not give them specifics as to what happened, just that they had hurt Mr. Pitcairn. He explained that they had taken Mr. Pitcairn's credit card, but he did not know what to do with it. Ms. Williams then suggested they use it to sell gas. Ms. Merritt and appellant told Mr. Cosby and Ms. Williams that they could not go outside for fear of the police. Mr. Cosby and Ms. Williams then offered to use Mr. Pitcairn's credit card to sell gas, on the condition that Mr. Cosby and appellant would split whatever money they made.

As they were leaving the house, Mr. Cosby took the bag containing appellant's shorts and Mr. Pitcairn's wallet and put it in a dumpster. Mr. Cosby and Ms. Williams returned to the house shortly thereafter; they were unable to use Mr. Pitcairn's credit card without having his zip code. Mr. Cosby got Mr. Pitcairn's wallet from the dumpster, obtained his Florida ID, and then appellant wrote Mr. Pitcairn's zip code on a lottery ticket and gave it to Mr. Cosby. Appellant removed the insert portion of appellant's wallet, which contained cards and

photos, put the rest of the wallet back in the plastic bag, and Mr. Cosby threw the bag back in the dumpster.

Mr. Cosby returned later with money and "ready," which Ms. Merritt testified was a form of crack cocaine. Appellant and Mr. Cosby smoked the crack in the bathroom and split the money between them. Mr. Cosby then woke Ms. Williams, who was sleeping on the floor, to go with him to the gas station.

After Ms. Williams and Mr. Cosby left, appellant began crying again. Ms. Merritt tried to console him, telling him that Mr. Pitcairn would be alright. Appellant and Ms. Merritt fell asleep, and they woke up to the sound of the police coming into the apartment. Appellant put Mr. Pitcairn's phone and the knife in a pair of shoes in a crate.

At trial, Ms. Merritt used a laser pointer to identify herself and appellant from the video footage taken of two people running on 26th and Charles Streets. She described appellant's clothing in the video, including the LeBron James jersey, khaki shorts, white tennis shoes, and a white hat. From the footage, it appeared that Ms. Merritt had something in her hands, which she testified were her flip-flops and Mr. Pitcairn's phone. Ms. Merritt identified the knife police found in the white shoe as the knife that appellant used to stab Mr. Pitcairn. She and appellant shared the white tennis shoes that were worn by appellant the night of the murder, which the police found underneath a chair in the room.

Ms. Merritt acknowledged that the facts she gave in her testimony were different from those she gave when she first spoke to the police. The initial version of events that she gave to the police, in a taped statement, was that, on July 25, 2010, she and appellant were at home all day, and that her cousin, Mr. Cosby, had come to the apartment with a credit card around 11:00 p.m. She gave the statement to protect appellant because she "didn't want him to go to jail."

After giving her initial statement, she went back to her cell. Later that day, she decided she wanted to speak to the detectives again because she "wanted the truth to get out," because "what happened to Mr. [Pitcairn] was wrong and it

shouldn't never happened." Ms. Merritt was led back to an interview room, passing appellant's cell on the way, and she began giving the police different information regarding her involvement. While in the interview room, she heard appellant shouting her name several times. After hearing appellant, she "felt that [she] was doing him wrong, so I told the police that I didn't want to cooperate." At that point, she ended the interview.

On September 13, 2010, after Ms. Merritt had been charged with murder and other offenses, she met with police detectives and an Assistant State's Attorney to discuss a proffer agreement. Ms. Merritt understood the terms of the agreement to be that nothing she said that day would be used against her in court unless she were to testify in her own defense. Ms. Merritt decided to tell the police what happened on July 25, 2010, because she "felt bad for the family," and Mr. Pitcairn's murder "wasn't even supposed to go down like that and it should have never happened." She initially lied about what happened to protect appellant, not herself, explaining: "[I]f I really wanted to protect myself then I would still not say nothing whatsoever."

On May 11, 2011, Ms. Merritt entered into a plea agreement, pursuant to which she would be given a 15–year sentence, the State would dismiss the murder charges and conspiracy to commit murder charges, and she would testify against appellant. Ms. Merritt acknowledged that she "could still be prosecuted for first-degree murder and conspiracy to commit first degree murder if the State [was] not satisfied with [her] testimony." Ms. Merritt, who had two prior convictions for possession of narcotics with intent to distribute was aware that, on April 18, 2011, her thumb print was found on Mr. Pitcairn's iPhone.

Ms. Williams and Mr. Cosby both testified for the State regarding the events leading up to and following Mr. Pitcairn's murder.[6] Ms. Williams had lived at 2607 Maryland Avenue

6. Their testimony was largely consistent. Neither Ms. Williams nor Mr. Cosby were charged with any crime in connection with the case. At the

for three months prior to July 25, 2010. She described the sleeping arrangements in the bedroom she shared, as follows: Ms. Thomas and Mr. Martin slept on the one bed in the room; appellant, whom Ms. Williams knew only as "Ya–Ya," and Ms. Merritt slept on a mattress on the floor; and Ms. Williams and Mr. Cosby slept on blankets on the floor. The back room of the apartment was occupied by a young woman, her boyfriend, and their baby.

On July 25, 2010, Ms. Williams, who described herself as a "moderate drug user," used cocaine and heroin throughout the day, stating that her drug use went "from the moment I woke up until like twelve o'clock that night." Mr. Cosby, who described himself as a "light drug user," testified that he used heroin and cocaine with Ms. Williams throughout the day. Ms. Williams and Mr. Cosby left the apartment around 9:00 a.m. and walked to Charles Street, and they remained out of the apartment all day.

At 11:00 p.m. on July 25, 2010, Ms. Williams and Mr. Cosby were sitting on a bench at a bus stop at Charles Street and 25th Street. Appellant and Ms. Merritt joined them and began talking. Ms. Williams testified that appellant said that he was looking for someone to rob, and while he and Ms. Merritt discussed robbing someone, she and Mr. Cosby just listened. Mr. Cosby testified that he did not participate in the conversation about robbing people because he did not want to "go[ ] to no jail for no stupid stuff." At the end of the conversation, appellant and Ms. Merritt walked away and turned right on 25th Street toward St. Paul Street, and Ms. Williams and Mr. Cosby walked up Charles Street back toward their apartment on Maryland Avenue.

On the way home, Ms. Williams and Mr. Cosby ran into a friend, with whom they used drugs. They then returned to the house and noticed police cars around the area of Charles

---

time of trial, however, Mr. Cosby was incarcerated on an assault charge.

Street and Maryland Avenue, as well as a police helicopter flying overhead.

When Ms. Williams and Mr. Cosby arrived at the apartment, appellant and Ms. Merritt were in their bedroom, along with Ms. Thomas and Mr. Martin, who were sleeping. Mr. Cosby testified that appellant and Ms. Merritt were "breathing all hard," and when he asked why they were out of breath, appellant told him that he "just beat this little white guy up so bad, I feel bad about what I did to him." Ms. Williams testified that appellant told her that "he had robbed this guy at the gas station . . . he hurt him real bad." Ms. Merritt and appellant then asked Ms. Williams and Mr. Cosby how to use a credit card to get cash. Appellant showed Ms. Williams and Mr. Cosby Mr. Pitcairn's credit card, wallet, Florida driver's license, and iPhone. Appellant came up with the idea to use the credit card at a gas station to buy people gas in exchange for cash, but he and Ms. Merritt did not want to go outside because the police were out, and appellant knew he had seriously hurt Mr. Pitcairn. Mr. Cosby volunteered to go instead.

Ms. Williams accompanied Mr. Cosby to the gas station, explaining that she was "fading" and wanted more drugs. They unsuccessfully attempted to use the card at one gas station, after which Ms. Williams returned to the house because she "didn't feel right." Mr. Cosby went to another gas station and then returned to the house twenty minutes later after he was unable to use the credit card without Mr. Pitcairn's zip code. Appellant then wrote Mr. Pitcairn's zip code down and gave it to Mr. Cosby.

Mr. Cosby testified that appellant instructed him to throw away Mr. Pitcairn's wallet, and he put the wallet in a dumpster. Mr. Cosby did not recall a pair of bloody shorts being in the bag.

When Mr. Cosby returned to the gas station, he used the card to buy gas in exchange for cash, and he then used some of the money to buy crack cocaine. He returned an hour later with the money and crack, which he split with appellant. Ms.

Williams and appellant then got into an argument. They left the apartment and continued arguing until they reached Charles Street and 25th Street.

At that point, Ms. Williams saw a police officer, and she flagged him down for the purpose of telling the officer that Mr. Cosby had a stolen credit card. Mr. Cosby, who had drugs and Mr. Pitcairn's credit card on him, ran. Ms. Williams then told the officer: "[T]here he goes . . . he's the one that did the robbery at the gas station." She made that statement to indicate that Mr. Cosby had the stolen credit card; she did not want him to have it.[7]

Mr. Cosby ran to a friend's house on Charles Street and "stayed in there until it got late." He was sitting on the front steps when he saw a police car coming up the street. Mr. Cosby got up and started walking down the street, with the officer following him. The officer flashed his lights at Mr. Cosby and told him to stop. At that point, Mr. Cosby had hidden Mr. Pitcairn's credit card, and he did not have any drugs on him. Mr. Cosby stopped, gave the officer his name, and the officer said that the police were looking for him. The officer asked Mr. Cosby about a murder, and Mr. Cosby said he did not know anything about anyone getting killed. The officer then took Mr. Cosby to the police station.

Ms. Williams' description of appellant's clothes that evening matched that given by Ms. Merritt, i.e., a LeBron James jersey, khaki-colored pants, a white hat, and white tennis shoes. She identified the white tennis shoes that contained a

---

7. Ms. Williams testified that the argument arose after she told appellant to put Mr. Pitcairn's driver's license in a mailbox. She wanted him to do so because, not realizing that Mr. Pitcairn was dead, and she felt that "people need their ID, it's important." Appellant told Mr. Cosby to "tell your girl shut-up," and then Ms. Williams and Mr. Cosby began arguing about Ms. Williams "running [her] mouth." Mr. Cosby, by contrast, testified that he and Ms. Williams left the apartment to try to buy more drugs, and their argument as they were leaving was because Ms. Williams wanted him to give her some of the money. Ms. Williams yelled that she was going to tell the police that Mr. Cosby had Mr. Pitcairn's credit card, and Mr. Cosby said: "[G]irl, be quiet, I'm going to give you some money."

knife and Mr. Pitcairn's iPhone as appellant's shoes, and she described the knife as "the knife that Ya–Ya carries." Ms. Williams had seen appellant with the knife the night of the murder.

Mr. Cosby testified that the white shoes under the chair in the room, as well as the LeBron James jersey, were appellant's. Mr. Cosby testified that he kept his clothes in a little black bag in the room, and that the only shoes he owned were the white and green shoes that he was wearing on July 25 and 26, 2010. Both Ms. Williams and Mr. Cosby acknowledged that they had prior convictions, Ms. Williams for robbery and theft, and Mr. Cosby for first-degree burglary, robbery, attempted distribution of cocaine, rogue and vagabond and theft.

Ms. Thomas testified that she owned the apartment at 2607 Maryland Avenue where she lived with appellant, Ms. Merritt, Ms. Williams, Mr. Cosby, and Mr. Martin. Ms. Williams and Mr. Cosby stayed at the apartment occasionally and kept "a couple plastic bags of clothes" in the room. On July 25, 2010, Ms. Thomas went to bed between 6:00 and 8:00 p.m. At that time, appellant, Ms. Merritt, Mr. Martin, and the family that lived in the back bedroom of the house were at home. Mr. Martin was lying in bed next to Ms. Thomas watching television, and appellant and Ms. Merritt were on their mattress on the floor, also watching television.

Ms. Thomas subsequently woke up between 2:30 and 3:00 a.m. She went into the kitchen and observed Mr. Cosby and Ms. Williams arguing; they then left the apartment. Ms. Thomas went back to sleep in the bedroom with Mr. Martin; Ms. Merritt and appellant also were in the bedroom. She woke up at approximately 7:30 or 8:00 a.m.; the police were entering the apartment. Ms. Thomas went to the police station, where she gave a taped statement, which was consistent with her testimony.

Ms. Thomas identified the jersey and shoes recovered from the apartment as belonging to appellant. She testified that she kept a butcher knife, several other knives, a box cutter, and a screwdriver under her mattress. Ms. Thomas had

never seen appellant with a knife, but she knew that her daughter, Ms. Merritt, carried a small pocket knife. Ms. Thomas acknowledged that she had prior convictions for second-degree burglary and possession with intent to distribute narcotics.

Mr. Martin testified that, on the day of the murder, he spent the day watching movies and drinking. Appellant and Ms. Merritt were at the apartment during the day; they left at approximately 11:00 p.m. and returned approximately an hour later. When appellant and Ms. Merritt left the apartment, Mr. Martin was watching movies, while Ms. Thomas was sleeping beside him. When Mr. Martin went to sleep at approximately 4:00 a.m., appellant and Ms. Merritt were on the floor sleeping. Mr. Martin identified the jersey found by police in the apartment as appellant's, along with the pair of white tennis shoes found under the chair in the front bedroom. He testified that the white tennis shoes found in the crate in the bedroom also belonged to appellant.

Detective Boris testified that Mr. Pitcairn's credit card records confirmed that his Citibank card was used on July 26, 2010, at 1:48 a.m. to make a $56.96 purchase at an ExxonMobile gas station, and then again at 2:07 a.m. to make a $43.64 purchase at the Greenmount BP Amoco station. Detective Boris obtained video footage from both gas station parking lots, which depicted a man, who Detective Boris identified as Mr. Cosby, purchasing gas.

The State presented numerous witnesses to explain the forensic evidence that was recovered during the investigation of Mr. Pitcairn's robbery and murder. The blood smudges observed by Detective Boris on the front door of 2607 Maryland Avenue yielded a DNA profile consistent with Mr. Pitcairn and the DNA of an unknown individual. Swabs taken from the neckline and sleeve cuffs of the jersey identified as appellant's, contained a DNA profile consistent with appellant, Ms. Merritt, and at least one unknown individual. Mr. Pitcairn, Ms. Thomas, Mr. Martin, and Ms. Williams could not be excluded as potential contributors to the DNA profile.

The suspected blood stain on the left shoe that police found under the chair yielded a DNA profile consistent with a mixture of Mr. Pitcairn's DNA and the DNA of another individual. Appellant and Ms. Merritt were identified as possible contributors to the DNA profile that was mixed with Mr. Pitcairn's. The chances of selecting an unrelated individual as a possible contributor to that sample was one in 118,000 for African American individuals.

Swabs taken from the interior of the shoe under the chair contained a DNA profile consistent with a mixture of appellant's, Ms. Merritt's, and at least two unknown individuals' DNA. Swabs from the right shoe contained a DNA profile consistent with a mixture of appellant's, Ms. Merritt's, and at least one unknown individual's DNA. A blood stain on the inside of the handle of the folding knife found inside one of the white shoes contained a DNA profile that was consistent with that of Mr. Pitcairn and an unknown individual.

Numerous pieces of evidence obtained from 2607 Maryland Avenue were tested for the presence of fingerprints. The only latent print that was found was on Mr. Pitcairn's iPhone, and fingerprint analysis revealed that the print matched Ms. Merritt's left thumb.

Dr. Russell Alexander, an Assistant Medical Examiner in the Office of Chief Medical Examiner in Baltimore, determined that Mr. Pitcairn's death was a homicide, and the cause of death was a two-inch deep stab wound to Mr. Pitcairn's chest, which injured the left ventricle, or the main pumping chamber, of his heart. He explained that a stab wound to the heart is characterized by "very rapid and very severe [ ] bleeding," both internally and externally. Dr. Alexander also observed scrapes on Mr. Pitcairn's lips as well as his left hand, knees, legs, and feet, but he was unable to determine whether the stab wound or the other injuries occurred first. Dr. Alexander agreed that abrasions could be a sign that a physical struggle occurred, but he opined that Mr. Pitcairn's injuries could have been caused by "terminal collapse," when an injured person falls to the ground as part of the dying process.

As indicated, the jury convicted appellant of first degree felony murder, armed robbery, and conspiracy to commit armed robbery. This timely appeal followed.

## DISCUSSION

### I.

### Voir Dire Question

■ During voir dire, the court addressed the potential jurors about the nature of the charges and then asked the following three-part question:

First, has any member of the jury panel ever been the victim of a violent crime? Second, has any member of the jury panel ever been convicted of a crime? And, third, does any member of the jury panel have a pending criminal charge?

The prosecutor asked that the court to broaden the question to include "any member of [the jurors'] immediate family." Defense counsel agreed, asking the court to further broaden the scope of the inquiry to include jurors' close friends. The court noted that, in previous trials, where a potential juror was "affected by a family member being a victim of a crime, they respond[ed]." It asked defense counsel whether the question he was proposing was "a mandatory voir dire question," and defense counsel responded that the question was not mandatory "in and of itself." The court denied the request.

Appellant contends that the circuit court erred in refusing to broaden the voir dire question regarding whether a panel member had been a victim of a violent crime to include family members and close friends. He argues that the voir dire question asked by the court, without the additional inquiry regarding family and friends, "was insufficient to root out prejudice" and was not adequately covered by other questions. He asserts that, given the facts of this case, "where the State presented evidence that the victim's mother was on the phone with the victim while he was being attacked," "a juror whose

family member or close friend had been victimized would be less able to set aside the emotional response in favor of an impartial assessment of the evidence."

The State argues that the circuit court properly exercised its discretion in declining to ask appellant's requested voir dire question, asserting that the question was "not reasonably likely to reveal a challenge for cause" and was "fairly covered by other questions posed by the court." [8] Specifically, it contends that, "whether the panel members, themselves, had ever been the victim of a violent crime was not a required area of inquiry in the first instance, and it was not incumbent upon the court to extend the inquiry to include friends and family." It further contends that, even if a prospective juror was biased based on his or her experience with a family member or friend who was a victim of a crime, that person would have strong feelings about the offense charged and would have responded to other voir dire questions asked by the court.

■■■ In Maryland, " 'the sole purpose of voir dire is to ensure a fair and impartial jury by determining the existence of cause for disqualification.' " *Washington v. State*, 425 Md. 306, 312, 40 A.3d 1017 (2012) (quoting *Stewart v. State*, 399 Md. 146, 158, 923 A.2d 44 (2007)). The voir dire process "entails examination of prospective jurors through questions propounded by the judge (or either of the parties, if allowed by the judge) to determine the existence of bias or prejudice, and literally translated, means 'to say the truth.' " *Charles and Drake v. State*, 414 Md. 726, 733, 997 A.2d 154 (2010).

We review a trial court's refusal to propound a requested voir dire question under the abuse of discretion standard.

---

8. In support, it cites the following voir dire questions:

Does any member of the panel hold such strong feelings regarding robberies or homicides, particularly those involving the use of a knife, that it would be difficult for you to fairly and impartially weigh the facts of the trial where such crimes have been alleged?

 * * *

[I]s there anything, including any philosophical, moral, religious, or other beliefs which would affect your ability to render a fair and impartial verdict in this case?

*State v. Shim,* 418 Md. 37, 43–44, 12 A.3d 671 (2011). We afford the trial court "broad discretion in running *voir dire,*" *id.* at 44, 12 A.3d 671 because "[t]he trial judge has had the opportunity to hear and observe the prospective jurors, to assess their demeanor, and to make factual findings." *Washington,* 425 Md. at 314, 40 A.3d 1017. The judge's conclusions are "entitled to substantial deference, unless they are the product of a voir dire that 'is cursory, rushed, and unduly limited.'" *Id.* (quoting *White v. State,* 374 Md. 232, 241, 821 A.2d 459 (2003)). That discretion, however, "is circumscribed by the defendant's 'right to have questions propounded to prospective jurors on their voir dire, which are directed to a specific cause for disqualification.'" *Shim,* 418 Md. at 44–45, 12 A.3d 671 (quoting *Moore v. State,* 412 Md. 635, 644–46, 989 A.2d 1150 (2010)).

■ The Court of Appeals has explained that specific causes for disqualification involve biases "directly related to (1) the defendant, (2) the witnesses, or (3) the crime." *Shim,* 418 Md. at 45, 12 A.3d 671. Thus, it is mandatory for the court to inquire into the following areas: bias based on race, ethnicity, or cultural heritage; bias against defense witnesses; religious bias; an unwillingness to convict in capital cases; a juror's strong feelings toward the crime charged; and placement of undue weight on police officer credibility. *Washington,* 425 Md. at 315, 40 A.3d 1017; *Shim,* 418 Md. at 45–46, 12 A.3d 671; *Curtin v. State,* 393 Md. 593, 609–10 n. 8, 903 A.2d 922 (2006).

■ Appellant concedes that "an affirmative answer to the question of whether a family member or close friend was the victim of a violent crime would not have provided cause for disqualification by itself." Maryland case law supports that concession.

In *Perry v. State,* 344 Md. 204, 217–18, 686 A.2d 274 (1996), *cert. denied,* 520 U.S. 1146, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997), the circuit court asked the venire: " 'Has any member of the prospective jury panel or a member of your family or a close personal friend of yours ever had a prior experience as a

juror, witness, victim or defendant in any criminal homicide or aggravated assault proceeding?' " On appeal, Perry argued that the court committed reversible error in declining to broaden the question to substitute "any crime of violence" for "aggravated assault." *Id.* at 218, 686 A.2d 274. The Court rejected that argument, stating:

A juror's having had prior experience as a juror, witness, victim or defendant in a criminal proceeding of any kind, or in one involving a crime of violence, is not *per se* disqualifying. It is even less tenable to argue that a juror is disqualified simply because of the experience of a member of the prospective juror's family or on the part of a close personal friend.

*Id. Accord Davis v. State,* 333 Md. 27, 37, 633 A.2d 867 (1993) ("Short of those instances where there is a demonstrably strong correlation between the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror."); *Yopps v. State,* 234 Md. 216, 221, 198 A.2d 264, *cert. denied,* 379 U.S. 922, 85 S.Ct. 279, 13 L.Ed.2d 336 (1964) (court did not abuse its discretion in refusing to ask whether any jurors or family members had been the victim of burglary because it did not relate to a cause of disqualification); *Phenious v. State,* 11 Md.App. 385, 388, 274 A.2d 658 ("an inquiry concerning whether or not a prospective juror has been the victim or a witness to a crime similar to the one charged in the indictment is not a proper question on voir dire since it does not provide a basis for challenge for cause"), *cert. denied,* 262 Md. 748 (1971).

Appellant notes that, in *Dingle v. State,* 361 Md. 1, 17, 759 A.2d 819 (2000), the Court of Appeals acknowledged "the relevance of the experiences and associations to the venire persons' qualification to serve on the jury." *Dingle* did not, however, overrule the above cited cases, and as appellant has acknowledged, the Court of Appeals, in subsequently listing the mandatory areas of inquiry, has not listed an inquiry regarding whether a juror, or family or friends, has been a victim of a crime. Given the existing precedent, we cannot

conclude here that, after exercising its discretion to ask potential jurors if they had been victims of violent crimes, the court abused its discretion in declining to broaden the question to include family members or close friends.[9]

Even if the Court of Appeals subsequently overrules its prior precedent, we note that, in this case, the trial judge determined, based on his experience, that other questions asked of the panel would elicit any bias related to the victimization of family members or friends. The record supports this determination; multiple panel members responded to the question asking if any member of the panel held "strong feelings regarding robberies or homicides," including panel members whose "strong feelings" were based upon the experience óf victimized family and friends. Accordingly, where the question appellant requested was not a mandatory question, and where other questions " 'created a reasonable assurance that prejudice would be discovered if present,' " *Washington*, 425 Md. at 313–14, 40 A.3d 1017 (quoting *White*, 374 Md. at 242, 821 A.2d 459), we cannot conclude that the court abused its discretion in conducting voir dire in this case.

## II.

### Other Crimes Evidence

Appellant next contends that his convictions should be reversed because other crimes evidence was improperly admitted on four occasions. Specifically, appellant argues that the court erred in: (1) admitting photo arrays containing his mug shot; (2) permitting Ms. Merritt to suggest that she knew he had committed other robberies; (3) admitting evidence that he used crack cocaine; and (4) denying his motion for a mistrial after Mr. Cosby testified that appellant had been "locked up"

---

9. We note that the Court of Appeals recently granted a Petition for Writ of Certiorari raising the question whether the trial court erred in refusing to ask in voir dire whether any member of the jury panel, or any member's family, friend or acquaintance, had been the victim of a crime. *Pearson v. State*, No. 2483, Sept. Term, 2010 (filed Mar. 5, 2013), *cert. granted*, No. 49, Sept. Term, 2013 (June 20, 2013).

in the past. The State argues, as set forth below, that the circuit court properly exercised its discretion with respect to each of the four rulings challenged by appellant.

## A.

### Photo Array

■ Appellant argues that the trial court erred in admitting into evidence the photo arrays from which Ms. Williams and Mr. Cosby identified him as the person who told them that he had robbed and hurt someone. He acknowledges that "the identity of Mr. Pitcairn's assailant was in dispute," but he asserts that "the ability of Ms. Williams and Mr. Cosby to identify [appellant] was not," and therefore, the photo arrays "added nothing of probative value to the State's case." Moreover, he argues, because the photo arrays "obviously contained mug shots," suggesting that he had committed other crimes, the prejudice in admitting the photo arrays outweighed any probative value.

The State argues that the court properly admitted the photo arrays. It asserts that they were relevant, and, contrary to appellant's contention, appellant's photo was not obviously a mug shot.

Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *State v. Simms*, 420 Md. 705, 725, 25 A.3d 144 (2011) (quoting Md. Rule 5–401). "Evidence that is not relevant is not admissible." Md. Rule 5–402. In reviewing a trial court's determination that evidence is relevant and admissible, we apply the "de novo" standard of review to the court's "conclusion of law that the evidence at issue is or is not 'of consequence to the determination of the action.' " *Simms*, 420 Md. at 725, 25 A.3d 144 (quoting *Parker v. State*, 408 Md. 428, 437, 970 A.2d 320 (2009)).

Even if legally relevant, however, "evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice." Maryland Rule 5–403. The weighing determination is left to the trial court's discretion and is reviewed for abuse of discretion. *Simms,* 420 Md. at 725, 25 A.3d 144. *Accord Cousar v. State,* 198 Md.App. 486, 517, 18 A.3d 130 (2011) (the " 'final balancing between probative value and unfair prejudice is something entrusted to the wide discretion of the trial judge' ") (quoting *Oesby v. State,* 142 Md.App. 144, 167, 788 A.2d 662 (2002)).

The Court of Appeals has explained that " 'a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.' " *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009) (quoting *North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994)). Rather, the " 'decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' " *Id.* (quoting *North,* 102 Md. App. at 14, 648 A.2d 1025). *Accord Oesby,* 142 Md.App. at 167–68, 788 A.2d 662 ("Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so.").

Thus, the first step in our analysis is whether the ability of Ms. Williams and Mr. Cosby to identify appellant in the photo arrays was relevant. The record reflects that Ms. Williams and Mr. Cosby had known appellant only for a few months before Mr. Pitcairn's murder, they spoke with him only in passing, and they knew him only as "Ya–Ya." Further, in light of Ms. Williams and Mr. Cosby's testimony that they had been using drugs the day and night of the murder, including during the time when they interacted with and observed appellant, their ability to accurately identify him was at issue. Accordingly, the fact that Ms. Williams and Mr. Cosby independently selected appellant's photo as that of "Ya–Ya" was relevant to show that they were able to accurately identify appellant.

Moreover, we disagree with appellant regarding the potential prejudice of the photo. To be sure, in *Arca v. State,* 71

Md.App. 102, 104, 106, 523 A.2d 1064, *cert. denied,* 310 Md. 276, 528 A.2d 1287 (1987), this Court held that the trial court erred in admitting into evidence a photographic array that included "what is obviously a police 'mug shot' of appellant," noting that the admission of the police photographs created a danger of unfair prejudice to the defendant because, "[w]ith the defense being self-defense, the jury's decision could well have been influenced by the thought that appellant had a prior record and was consequently a bad person." In that case, however, the photographs "showed the front and profile view commonly associated with police 'mug shots.'" *Id.* at 106, 523 A.2d 1064.

Here, by contrast, appellant's photo displayed in the arrays was not "obviously" a mug shot. Rather, the photo was a head shot of appellant, taken from a similar perspective as the other photos in the array, in which all that was visible was appellant's face and neck area. Appellant's photograph was not obviously a mug shot. The circuit court properly exercised its discretion in admitting the photo arrays as relevant evidence that did not pose a risk of unfair prejudice to appellant.

## B.
### Ms. Merritt's Testimony

Prior to trial, the court addressed the admissibility of evidence of Ms. Merritt's understanding of the following question appellant asked Ms. Merritt: "[D]o you want to make some money[?]" The State proffered that Ms. Merritt would testify that she understood that to mean that appellant wanted to commit a robbery, based on her "participation in past robberies with the Defendant." Defense counsel objected to Ms. Merritt's testimony as "inadmissible other crimes evidence," arguing that the testimony was "an attempt to admit through the back door prior alleged untried robberies committed by [appellant]."

The court ruled that the State could elicit Ms. Merritt's interpretation of Mr. Wagner's question, but not the basis for her interpretation. The court reasoned that the "interpretive

statement" was "relevant, intrinsic evidence of the crime of conspiracy," and "the probative value of this outweighs any unfair prejudice."

At trial, Ms. Merritt testified that, when she and appellant left their apartment the day of the robbery, appellant said he "wanted some money." Ms. Merritt understood appellant to mean that he "wanted to rob somebody."

Appellant argues on appeal that the court abused its discretion in admitting this evidence because it permitted Ms. Merritt "to suggest that she knew [a]ppellant to have committed other robberies." The State disagrees, arguing that this evidence did not constitute other crimes evidence, and, in any event, it was relevant to the crime of conspiracy. Finally, the State contends, "even assuming the testimony was admitted in error, the error is harmless beyond a reasonable doubt because it was merely cumulative to other evidence to the same effect."

We agree that the evidence was not other crimes evidence, but rather, it was admissible to show agreement between appellant and Ms. Merritt, a critical element to the charge of conspiracy. See *Mitchell v. State*, 363 Md. 130, 146, 767 A.2d 844 (2001) ("[C]onspiracy is necessarily a specific intent crime; there must exist the specific intent to join with another person in the accomplishment of an unlawful purpose or a lawful purpose by unlawful means."). And, because the evidence was highly probative to establish the element of one of the crimes charged, the circuit court did not abuse its discretion in determining that the admission of the evidence did not unfairly prejudice appellant.

## C.

### Evidence of Drug Use

■ Appellant next argues that the circuit court erred in allowing testimony that appellant used drugs following Mr. Pitcairn's robbery and murder.[10] He contends that this con-

---

10. Prior to trial, the State moved to admit evidence that appellant was a drug user, and that, after the robbery and murder, he shared crack

stituted other crimes evidence, and the court erred in admitting the post-crime drug use as proof of motive, asserting that "use of drugs did not, in an of itself, make it any more likely that he committed the robbery absent evidence that he had a special financial need caused by drug use."

The State contends that the circuit court properly exercised its discretion in admitting evidence that appellant "shared in the proceeds of the robbery." It asserts that the evidence was properly admitted as: (1) evidence intrinsic to the crime of robbery and probative of the crime itself; and (2) evidence of motive.

In arguing that evidence of appellant's post-crime drug use was inadmissible other crimes evidence, appellant ignores the first basis for the court's ruling, that the evidence was "intrinsic or relevant to the actual crime itself" and "probative of the crime itself." The court explained:

[The evidence] shows [appellant's] connection to the crime as he had a connection to the proceeds and what was purchased with the proceeds. And that he, immediately after the proceeds were converted to drugs, that he was able to take the drugs, and also shows a relationship with Mr. Cosby and could complete the picture of the post-crime activity and [appellant']s relation with Mr. Cosby.

And therefore, I find that again its probative value under Rule 5–403 outweighs its unfair prejudice to [appellant]. Alternatively, the court found that the evidence was admissible as other crimes evidence because it was probative of motive, it could be "proven by clear and convincing evidence," and "the probative value outweighs any unfair prejudice to [appellant]."

We agree with the court that the evidence was admissible on either ground. Initially, the evidence was intrinsic to the

cocaine, purchased with cash obtained through the use of Mr. Pitcairn's credit card, with Mr. Cosby. The court granted the State's motion in part, excluding evidence pertaining to appellant's pre-crime drug use, but ordering that evidence of appellant's post-crime drug use was admissible.

crimes charged. *See Silver v. State*, 420 Md. 415, 435–36, 23 A.3d 867 (2011) (evidence that was "intertwined and part of the same criminal episode" did not "engage the gears of 'other crimes' evidence law," even though it may " 'show some possible crime in addition to the one literally charged' ") (quoting *Odum v. State*, 412 Md. 593, 611, 989 A.2d 232 (2010)), *cert. denied*, —— U.S. ——, 132 S.Ct. 1039, 181 L.Ed.2d 765 (2012). Evidence that appellant shared in the proceeds of the robbery and drugs obtained with cash received from use of Mr. Pitcairn's credit card, shortly after the robbery, was probative of appellant's participation in the robbery.

Alternatively, the circuit court properly admitted the testimony pursuant to an "other crimes" analysis. Rule 5–404(b) provides as follows:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Pursuant to this Rule, "[p]ropensity evidence, or evidence suggesting that because the defendant is a person of criminal character it is more probable that he committed the crime for which he is on trial, is not admissible into evidence." *Hurst v. State*, 400 Md. 397, 407, 929 A.2d 157 (2007). Evidence of other crimes may be admissible, however, if the evidence has " 'special relevance, i.e. is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character.' " *Id.* at 408, 929 A.2d 157 (quoting *Harris v. State*, 324 Md. 490, 500, 597 A.2d 956 (1991)).

To determine the admissibility of other crimes evidence, the court must engage in a three-step analysis. *Id.* (citing *State v. Faulkner*, 314 Md. 630, 634–35, 552 A.2d 896 (1989)). First, the evidence must fall within one of the exceptions listed in Rule 5–404(b), or otherwise have special relevance to some contested issue in the case. *Thompson v.*

*State,* 181 Md.App. 74, 84, 955 A.2d 802 (citing *Faulkner,* 314 Md. at 634–35, 552 A.2d 896), *aff'd,* 412 Md. 497, 988 A.2d 1011 (2010). The determination of whether evidence has special relevance is a legal determination that does not involve any exercise of discretion. *State v. Westpoint,* 404 Md. 455, 489, 947 A.2d 519 (2008) (citing *Wynn v. State,* 351 Md. 307, 317, 718 A.2d 588 (1998)).

 After determining whether the contested evidence falls within an exception to the general bar on the use of other crimes evidence, the court must find that the accused's involvement in the other crimes is established by clear and convincing evidence. *Henry v. State,* 184 Md.App. 146, 168, 964 A.2d 678 (2009) (quoting *Faulkner,* 314 Md. at 634–35, 552 A.2d 896), *aff'd on other grounds,* 419 Md. 588, 19 A.3d 944 (2011). This Court "will review this decision to determine whether the evidence was sufficient to support the trial judge's finding." *Faulkner,* 314 Md. at 635, 552 A.2d 896. In conducting this review on appeal, "we look 'only at the legal question of whether there was some competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue.' " *Henry,* 184 Md.App. at 168–69, 964 A.2d 678 (quoting *Emory v. State,* 101 Md.App. 585, 622, 647 A.2d 1243 (1994)).

 If that requirement is met, the trial court then must weigh the necessity for and probative value of the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 167–68, 964 A.2d 678. The trial court's conclusion to admit or deny this evidence based on its probative value will be reviewed under an abuse of discretion standard. *See Faulkner,* 314 Md. at 641, 552 A.2d 896. ("A decision to admit other crimes evidence which is clearly incorrect 'on this question of balancing probative value against danger of prejudice will be corrected on appeal as an abuse of discretion.' ") (quoting *Brafman v. State,* 38 Md.App. 465, 474, 381 A.2d 687 (1978)).

Here, the circuit court properly determined that the evidence of appellant's post-crime drug use was admissible to

show appellant's motive for robbing the victim, i.e., to obtain cash and drugs. Moreover, in light of the serious nature of the charges against appellant, the court properly determined that evidence that he used a small amount of drugs was not unfairly prejudicial in light of its probative value in connecting appellant to the chain of events that occurred following the crime.[11] The circuit court did not abuse its discretion in admitting this evidence.

## D.

### Mistrial

On direct examination of Mr. Cosby, the prosecutor asked Mr. Cosby whether he knew how long Ms. Merritt and appellant were a couple. Mr. Cosby replied: "No, sir. I knew he was locked up and he came home and they introduced...." At that point, defense counsel objected and moved for a mistrial. The court stated that Mr. Cosby's statement about appellant being "locked up" was "absolutely quick," noting: "I have to say myself I didn't quite catch it." The State argued that it was not clear how Mr. Cosby's statement would prejudice appellant, as "[w]e don't know why he was locked up, when he was locked up or anything having to do [with] that." Defense counsel declined to have the court strike Mr. Cosby's statement, arguing that striking the testimony would "place undue emphasis on it," and he declined an instruction to the jury not to consider the testimony based on his "fear it highlights" the testimony. The court, after listening to the testimony again, and considering the issue overnight, denied the motion for mistrial.

Appellant argues that the court abused its discretion in denying his motion. He candidly acknowledges that this Court previously has upheld a trial court's ruling denying a mistrial based on an isolated statement that the appellant had been "locked up." *See Mitchell v. State,* 132 Md.App. 312,

---

11. Appellant does not dispute the court's finding of clear and convincing evidence of his drug use.

323–29, 752 A.2d 653 (2000) (court did not abuse its discretion in denying defendant's motion for a mistrial where a witness made an isolated, unresponsive statement that defendant had been "locked up"), *rev'd on other grounds*, 363 Md. 130, 767 A.2d 844 (2001); *Turner v. State*, 48 Md.App. 370, 377, 428 A.2d 88 (1981) (court did not err in denying defendant's motion for mistrial where witness, on cross-examination by the State, testified that defendant had been "locked up"), *rev'd on other grounds*, 294 Md. 640, 452 A.2d 416 (1982).

Appellant contends, however, that this case is distinguishable because the reference here was prejudicial given the other prior bad act evidence elicited. He argues that Mr. Cosby's remark followed Ms. Merritt's "suggest[ion] that she and [appellant] had a history of committing robberies," and the evidence that Ms. Williams "identified [appellant] from his mug shot in a photo array." He asserts that the jury "only had to put two and two together to infer that the three references were related and that [appellant] was not facing a robbery charge for the first time." Accordingly, he contends that there was no way to eliminate the prejudice from Mr. Cosby's statement "short of granting a mistrial."

The State asserts that the court's ruling was correct as a matter of law, and that appellant "has failed to demonstrate that he suffered the substantial prejudice necessary to warrant the extraordinary remedy of a mistrial." It further argues that appellant's contention that Mr. Cosby's remark was highly prejudicial when combined with Ms. Merritt's testimony and with Ms. Williams' identification is not properly before this Court, as it was not made before the circuit court, nor was it the basis for the circuit court's ruling.

Initially, we agree with the State that appellant's contention that a mistrial was required because the evidence as a whole gave the inference that appellant was "not facing a robbery charge for the first time" is not preserved for our review because it was not raised below. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide [an] issue unless it plainly appears by the record to have been raised in

or decided by the trial court.").[12] Thus, we address only the issue preserved, counsel's argument below that the testimony that appellant had been "locked up" required a mistrial because "the jury is going to speculate now that my client was locked up for something else, that he was a bad guy."

A mistrial "is an extraordinary act which should only be granted if necessary to serve the ends of justice.' " *Cooley v. State,* 385 Md. 165, 173, 867 A.2d 1065 (2005) (quoting *Jones v. State,* 310 Md. 569, 587, 530 A.2d 743 (1987)). The determination whether to grant a mistrial " 'is addressed to the sound discretion of the trial court.' " *Id.* at 173, 867 A.2d 1065 (quoting *Wilhelm v. State,* 272 Md. 404, 429, 326 A.2d 707 (1974)). " 'Ordinarily, the exercise of that discretion will not be disturbed upon appeal absent a showing of prejudice to the accused,' " and " '[i]n order to warrant a mistrial, the prejudice to the accused must be real and substantial.' " *Washington v. State,* 191 Md.App. 48, 99, 990 A.2d 549 (2010) (quoting *Wilson v. State,* 148 Md.App. 601, 666, 814 A.2d 1 (2002)).

As indicated, this Court previously rejected the argument that a mistrial is required based on testimony that a defendant had been "locked up." *See Mitchell,* 132 Md.App. at 323–29, 752 A.2d 653; *Turner,* 48 Md.App. at 377, 428 A.2d 88. In *Mitchell,* 132 Md.App. at 323, 752 A.2d 653, a witness stated, in response to a question whether he had seen Mr. Mitchell in a certain time period, that a friend of Mr. Mitchell's told him that Mr. Mitchell was "locked up." We upheld the trial court's denial of the defense motion for a mistrial, stating: "[W]e are not persuaded that any significant damage resulted from [the] remark, as it was a single, isolated statement that was wholly unresponsive to the State's question, and the court's curative instruction was adequate to overcome any taint." *Id.* at 328–29, 752 A.2d 653.[13]

---

12. Although we may exercise our discretion to review an issue for plain error, that is rarely done, *see Robinson v. State,* 209 Md.App. 174, 202–03, 58 A.3d 514 (2012), *cert. denied,* 431 Md. 221, 64 A.3d 497 (2013), and, appellant has not requested plain error review.

13. Here, as indicated, defense counsel declined a curative instruction.

In *Turner*, 48 Md.App. at 377, 428 A.2d 88, a witness responding to a question on cross-examination regarding whether he and the defendant spent time together, answered: " 'No, because he was locked up then.' " The trial court denied the defendant's subsequent motion for mistrial, and we affirmed, reasoning that "the response given . . . was inadvertent and unexpected," and "the bald statement that 'he was locked up then' would seem to carry very little prejudicial information." *Id.*

Similarly, here, the bald statement was isolated, unsolicited and unlikely to cause significant prejudice. The circuit court did not abuse its discretion in declining to employ the extraordinary remedy of the declaration of a mistrial based on this statement.

### III.

### Appellant Shouting Ms. Merritt's Name During Custody

Appellant's next contention is based on the admissibility of Ms. Merritt's testimony regarding her statement to the police. As indicated, she testified that, when she was taken into custody, she initially gave a statement that she and appellant were at home all day, and that Mr. Cosby had come to the apartment with a credit card around 11:00 p.m. Ms. Merritt later initiated further contact with the detectives because she "wanted the truth to get out." On the way to the interview room, Ms. Merritt passed appellant's cell. In the interview room, she began to give a second statement to the police, but she stopped when she heard appellant shouting her name from his holding cell. Ms. Merritt testified that, after hearing appellant, she "felt that I was doing him wrong, so I told the police that I didn't want to cooperate," and she ended the interview.

Appellant contends that the circuit court "erred in admitting evidence that [he] called out Ms. Merritt's name while he was in custody," asserting that the evidence was "too ambiguous" to be relevant and was "unfairly prejudicial." Moreover, he contends that, "to the extent that the evidence had some

probative value, it also brought with it a high risk of unfair prejudice to [him] in that the jury was likely to infer that [he] wanted Ms. Merritt to keep quiet as he had done." He argues that, to counteract that prejudice, the court should have allowed him to introduce his taped statement given to police before he called out Ms. Merritt's name, based on "the doctrine of completeness and fundamental fairness." [14]

The State argues that the court properly exercised its discretion: (A) to admit evidence that appellant repeatedly shouted Ms. Merritt's name; and (B) to refuse to admit appellant's exculpatory statement to police. With respect to the relevancy of appellant's shouting to Ms. Merritt, it argues that the jury could "reasonably infer from the circumstances" that, when appellant saw Ms. Merritt return to the interview room for a second time in the company of the police, "he shouted out her name in order to silence her or intimidate her so that she would not incriminate him." With respect to appellant's contention that his statement to the police should have been admitted pursuant to the doctrine of completeness or as a matter of fundamental fairness, the State argues that this contention is without merit, asserting that the doctrine of completeness is inapplicable and the cases appellant cites regarding fundamental fairness do not "remotely support" the admission of appellant's exculpatory statement.

## A.

### Evidence of Shouting

As indicated, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. "Relevant evidence may be excluded, however, if it is

---

**14.** Defense counsel proffered that, in the statement he gave to the police, appellant stated that he was at home at the time of Mr. Pitcairn's robbery and murder, and Mr. Cosby came in asking how to use a credit card.

unfairly prejudicial, confusing to the fact finder, or a waste of time." *Decker v. State,* 408 Md. 631, 640, 971 A.2d 268 (2009).

 "It is well established in Maryland that, '[i]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5–403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt.'" *Decker,* 408 Md. at 640, 971 A.2d 268 (quoting *Thomas v. State ("Thomas I"),* 372 Md. 342, 351, 812 A.2d 1050 (2002)). To be relevant, evidence of post-crime conduct must satisfy four inferences: (1) from the defendant's conduct, a desire to evade prosecution or conceal evidence; (2) from a desire to evade prosecution or conceal evidence, consciousness of guilt; (3) from consciousness of guilt, consciousness of guilt with respect to the charged offenses; and (4) from consciousness of guilt with respect to the charged offenses, actual guilt. *Thomas v. State ("Thomas II"),* 397 Md. 557, 576, 919 A.2d 49 (2007). The evidence need not " 'conclusively establish guilt,'" but rather, the " 'proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt. If so, the evidence is relevant and generally admissible.'" *Id.* at 577, 919 A.2d 49 (quoting *Thomas v. State,* 168 Md.App. 682, 712, 899 A.2d 170 (2006)). "Simply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible." *Id.* at 578, 919 A.2d 49.

Here, a reasonable fact finder could infer that, when appellant saw Ms. Merritt return to the interview room for the second time, he yelled Ms. Merritt's name in an effort to stop her from making further statements to the police regarding Mr. Pitcairn's robbery and murder.[15] This desire to conceal evidence is consistent with consciousness of guilt regarding his actions, as well as actual guilt. Although, as appellant asserts, there may have been another explanation for appellant shout-

---

**15.** The evidence indicated that the shouting had this effect on Ms. Merritt; she stopped the interview.

ing Ms. Merritt's name, appellant offered no such explanation, and the issue was one for the jury to determine. It did not render the evidence irrelevant.

Further, the admission of Ms. Merritt's testimony did not unfairly prejudice appellant. Appellant appears to argue that, because evidence was admitted regarding his statement to Ms. Merritt, the jury would unfairly infer that this was the only statement he made while he was in custody, i.e., that he remained silent, which was incorrect. We are not persuaded. There was no error in admitting this evidence.

## B.

### Admissibility of Appellant's Statement

We similarly are not persuaded that the court erred in declining to admit into evidence appellant's exculpatory statement to the police, which he made prior to yelling Ms. Merritt's name. The general rule is that a defendant is not entitled to admit an exculpatory statement. *Conyers v. State,* 345 Md. 525, 544, 693 A.2d 781 (1997) (exculpatory out-of-court statement offered by appellant was "inadmissible hearsay"), *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). Appellant relies, however, on the doctrine of verbal completeness, arguing that his statement denying guilt "was admissible to rebut any inference that he did not talk to the police." As indicated, we are not persuaded by the factual assumption in this argument.

In any event, the doctrine of verbal completeness does not apply here. That doctrine provides that, "[w]hen part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Md. Rule 5–106. The doctrine of completeness "allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or conversation." *Conyers,* 345 Md. at 541, 693 A.2d 781. Here, evidence that appellant

shouted Ms. Merritt's name was not the "remainder" of appellant's prior exculpatory statement to the police, but rather, it was a separate incident generated by events that occurred after appellant's statement ended. The doctrine of verbal completeness is inapplicable.

■■■■■■ Nor should the exculpatory statement have been admitted as a matter of fundamental fairness, which applies when reliable evidence is excluded due to "arbitrary" state evidentiary rules. *See Holmes v. South Carolina*, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (the Constitution "prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote."). As indicated, the statement here was not admissible because it was " 'inherently suspect as being self-serving.' " *Conyers*, 345 Md. at 545, 693 A.2d 781 (quoting *Muir v. State*, 64 Md.App. 648, 656, 498 A.2d 666 (1985)). The doctrine of fundamental fairness does not apply here, and the circuit court's rulings in this regard will not be reversed.

## IV.

### Cross–Examination on Witness Eligibility for Parole

During defense counsel's cross-examination of Ms. Merritt regarding her plea agreement with the State, the following colloquy occurred:

> [DEFENSE COUNSEL]: So, if you testify consistently with the State's version of events, you will receive a jail sentence of 15 years; is that correct?
>
> [MS. MERRITT]: Yes.
>
> [DEFENSE COUNSEL]: So—and you are aware that on a 15 year jail sentence you will be eligible for parole after 7 and a half—

The court then sustained the State's objection.

On appeal, appellant contends that the circuit court erred in restricting his ability to cross-examine Ms. Merritt regarding her eligibility for parole after serving half of the sentence

called for by the plea agreement. He argues that the court's restriction on his cross-examination of Ms. Merritt was prejudicial, reversible error.

The State contends that the court "properly excluded evidence that was only marginally probative to impeach [Ms.] Merritt and that strayed into a collateral matter that would have confused the jury." It further argues that appellant's question was improper because it was not something within Ms. Merritt's personal knowledge.

"The Confrontation Clause of the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him." *Martinez v. State,* 416 Md. 418, 428, 7 A.3d 56 (2010). A defendant's right to cross-examine a witness, however, is not unlimited: " '[T]rial courts retain wide latitude in determining what evidence is material and relevant, and to that end, may limit, in their discretion, the extent to which a witness may be cross-examined for the purpose of showing bias.' " *Parker v. State,* 185 Md.App. 399, 426, 970 A.2d 968 (2009) (quoting *Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997)). *Accord Martinez,* 416 Md. at 428, 7 A.3d 56 ("A trial court may impose reasonable limits on cross-examination when necessary for witness safety or to prevent harassment, prejudice, confusion of the issues, and inquiry that is repetitive or only marginally relevant.").

" 'Managing the scope of cross-examination is a matter that falls within the sound discretion of the trial court.' " *Parker v. State,* 185 Md.App. at 426, 970 A.2d 968 (quoting *Simmons v. State,* 392 Md. 279, 296, 896 A.2d 1023 (2006)). This discretion is exercised by balancing " 'the probative value of an inquiry against the unfair prejudice that might inure to the witness. Otherwise, the inquiry can reduce itself to a discussion of collateral matters which will obscure the issue and lead to the fact finder's confusion.' " *Pantazes v. State,* 376 Md. 661, 681, 831 A.2d 432 (2003) (quoting *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319 (1983)).

In *Coleman v. State*, 321 Md. 586, 610, 583 A.2d 1044 (1991), the Court of Appeals upheld the circuit court's ruling precluding cross-examination of a witness's awareness, when he entered into his plea agreement, that he faced a mandatory life sentence without parole. The Court held that, in light of all the other testimony regarding the witness's motives to testify, his bias, and otherwise to impeach his credibility, this evidence "would be of minimal significance, if any at all, and certainly would not be essential for the jury to appreciate fully the 'sweetness' of the deal made by the State to encourage him to testify." *Id.* at 611, 583 A.2d 1044.

Similarly, here, Ms. Merritt's motive to lie was extensively explored. Defense counsel asked Ms. Merritt whether she realized that, if she testified "consistently with the State's version of events," the charges of murder and conspiracy to commit murder would be nol prossed. Counsel read the terms of Ms. Merritt's plea agreement to that effect, and he highlighted that her "consistent" testimony would result in her receiving a 15 year sentence, as opposed to, as phrased by defense counsel, "a possible sentence of double life plus 40 years," that she otherwise would face. Counsel's question regarding Ms. Merritt's understanding of her potential eligibility for parole was a collateral issue that could have caused confusion to the jury, and the court properly exercised its discretion in limiting the scope of appellant's cross-examination.

## V.

### Hearsay

██ Appellant's next contention involves the testimony of Detective Raymond Hunter, who showed the photo arrays containing appellant's photo to Ms. Williams and Mr. Cosby. Detective Hunter testified regarding the process by which he presented the arrays to Ms. Williams and Mr. Cosby. With respect to Ms. Williams, after Detective Hunter showed her the photo array, he asked her to initial the array sheet, sign it, and in the "comment" section, state in her own words why she

identified the person she selected. Ms. Williams wrote: "Y[a]-y[a] brag to me and my boyfriend Kevin Cosby how he terrible beat up the guy and that he rob him."

Detective Hunter repeated the same process with Mr. Cosby. He explained, however, that nothing was written on the back of the photo array because, when he asked Mr. Cosby to "in his own words place who this individual was and what part did they have in this particular incident now being investigated," Mr. Cosby answered that he "couldn't read and write." The comments section of Mr. Cosby's photographic array sheet is blank.

Appellant argues that the circuit court erred in admitting Detective Hunter's testimony that Mr. Cosby told the detective that he could not read and write, asserting that this testimony was inadmissible hearsay. He contends that this testimony was prejudicial because the State's theory was that appellant wrote the zip code for the credit card on the lottery ticket recovered because Mr. Cosby could not read and write.[16]

The State argues that the court properly admitted Detective Hunter's statement because it was not admitted for the truth of the matter asserted, and therefore, it was not hearsay. It further assets that, "even if the testimony was inadmissible hearsay, the error in admitting it was harmless because whether [appellant] or Cosby wrote the number on the lottery ticket was not a significant issue at trial, if it was an issue at all."

A ruling involving the admission of hearsay ordinarily is an issue of law that we review *de novo*. *In re Matthew S.*, 199 Md.App. 436, 461, 23 A.3d 250 (2011). Hearsay is an out-of-court statement, offered by someone other than the declarant, to prove the truth of the matter asserted. Md. Rule 5–801(c). Hearsay generally is inadmissable. Md. Rule 5–802. An out-of-court-statement may be admissible, however, "if it is not being offered for the truth of the matter asserted or if it

---

**16.** As indicated, the zip code was needed to use the credit card to purchase fuel at the gas station.

falls within one of the recognized exceptions to the hearsay rule." *Conyers v. State,* 354 Md. 132, 158, 729 A.2d 910 (1999).

Here it is clear that Detective Hunter's testimony was not offered to prove the truth of the matter asserted, i.e., that Mr. Cosby could not read or write. Rather, the testimony was elicited to explain why the comments section of his photographic array sheet was blank, as opposed to that of Ms. Williams, on which she wrote her comments. The testimony was not hearsay, and the court did not err in admitting it.

Moreover, appellant does not provide any citation to the record to support his factual assertion that the State's theory was that Mr. Cosby's inability to write made clear that appellant wrote the zip code on the lottery ticket. *See Pulte Home Corp. v. Parex, Inc.,* 174 Md.App. 681, 760–61, 923 A.2d 971 (2007) ("We decline to comb through the eight-volume, 3,876–page record extract to ascertain information that . . . should have [been] provided—a clear reference to a page or pages of the record extract."). Our review of the record indicates that the issue of who wrote Mr. Pitcairn's zip code on the lottery receipt was not an important issue at trial; indeed, the prosecutor did not even mention it in opening statement or closing argument. We are satisfied that " 'there is no reasonable possibility' " that the error, if any, contributed to the guilty verdict. *See State v. Stringfellow,* 425 Md. 461, 474, 42 A.3d 27 (2012) (quoting *Lee v. State,* 405 Md. 148, 164, 950 A.2d 125 (2008)). Accordingly, even if the court erred in allowing Detective Hunter's testimony, any error was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976); *Morris v. State,* 418 Md. 194, 221–22, 13 A.3d 1206 (2011).

## VI.

### Jury Instructions

Appellant's next contention involves the jury instructions regarding flight and concealment of evidence. Appellant initially objected to the State's request for any such instructions, asserting that, the "evidence is not clear at all" that

appellant attempted to flee or conceal himself. Alternatively, he requested that the instructions "be read and applied to [Mr.] Cosby." The State objected to appellant's request that the instructions be given with respect to Mr. Cosby, arguing that there was no legal support for modifying the instructions to include "other people . . . not charged in this case."

The circuit court gave the following instructions to the jury:

A person's flight and/or concealment immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt.

Flight and/or concealment under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight and/or concealment by the Defendant *or some other person* in this case. If you find, if you decide there is evidence of flight and/or concealment by the Defendant *or some other person in this case,* you then must decide whether this flight and/or concealment shows a consciousness of guilt. You've heard . . . evidence that the Defendant and *other persons* may have concealed or destroyed evidence in this case.

Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt. Concealment or destruction of evidence may be motivated again by a variety of factors, some of which are fully consistent with innocence. You must first decide whether the Defendant, *and/or some other person,* or persons concealed or destroyed evidence in this case. And if you find that the Defendant, *and/or some other person, or persons* concealed or destroyed evidence in this case, then you must decide whether this conduct, that particular conduct, shows a consciousness of guilt.

(Emphasis added). At the conclusion of the instructions, appellant objected to the instructions, and he renewed his request that Mr. Cosby's name be included in the instructions.

Appellant contends that the court erred in refusing to give the instructions he requested, asserting that his instructions "correctly stated the law, were supported by the evidence, and were not fairly covered by the other instructions." The State disagrees, asserting that appellant "received more than that to which he was entitled when the trial court modified [the pattern instructions] to include persons in addition to the defendant," and that the instructions, as modified, were not prejudicial to appellant.

Maryland Rule 4–325(c) provides that the trial court must, upon the request of any party, instruct the jury regarding the applicable law. *Tucker v. State*, 407 Md. 368, 379, 965 A.2d 900 (2009). The court is required to give a requested instruction if: " '(1) the requested instruction is a correct statement of law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given.' " *McMillan v. State*, 428 Md. 333, 354, 51 A.3d 623 (2012) (quoting *Thompson v. State*, 393 Md. 291, 302–03, 901 A.2d 208 (2006)). As we recently explained, "[a]n appellate court reviews a trial court's decision not to grant a jury instruction under an abuse of discretion standard." *Hajireen v. State*, 203 Md.App. 537, 559, 39 A.3d 105 *cert. denied*, 429 Md. 306, 55 A.3d 908 (2012).

Here, the circuit court acted within its discretion in declining appellant's request to modify the jury instructions for flight or concealment or destruction of evidence. The Court of Appeals has noted the distinction between instructions with respect to the *"applicable law "* which, upon request and under proper circumstances, are required to be given pursuant to Rule 4–325(c), and instructions regarding facts and inferences of fact, which are "normally not required." *Patterson v. State*, 356 Md. 677, 683–85, 741 A.2d 1119 (1999). Accordingly, trial judges generally "need not instruct, even when requested or when facts might support the inference, on the presence or absence of most evidentiary inferences." *Id.* at 694, 741 A.2d 1119; *cf. Cost v. State*, 417 Md. 360, 373, 378–

80, 10 A.3d 184 (2010) (reaffirming the principle stated in *Patterson* but determining that, under the "unusual facts" in that case, "substantive Maryland evidence law" required a missing evidence instruction). Appellant has cited no authority supporting his argument that the court was required to modify the Maryland Criminal Pattern Jury Instructions ("MPJI–Cr") on flight and concealment of evidence to include factual inferences the jury could make relating to Mr. Cosby.

Indeed, we note that MPJI–Cr 3:24 is entitled, "Flight or Concealment *of Defendant,*" and MPJI–Cr 3:26 twice refers to *"the defendant "* concealing or destroying evidence in the case. As the jury is determining the guilt or innocence of the defendant, not a witness, the instructions apply only to the defendant's conduct, i.e., whether there was proof beyond a reasonable doubt that appellant committed the crimes. As the instructions are not written to include a person other than the defendant, appellant received more than that to which he was entitled when the trial court modified the jury instructions to include "some other person." The court did not abuse its discretion in declining to further modify the pattern instructions as requested by appellant.[17]

## VII.

### Shackling of Appellant During the Rendition of the Verdict

Appellant's final contention involves the court's decision that he remain in restraints during the rendition of the verdict and the polling of the jury. He asserts that the court abused its discretion in making this decision without first making an individualized determination of need.

The State argues that the court properly exercised its discretion in ordering that appellant remain shackled when the verdict was rendered. In any event, it contends that "there is

---

17. We note that defense counsel was free to argue in his closing argument, which he did, that Mr. Cosby was the perpetrator and had fled and concealed evidence.

no evidence that the jury ever saw [appellant's] restraints, and the trial court observed that they could not be seen," and therefore, appellant failed to meet his burden of establishing actual prejudice.

## A.

### Proceedings Below

After the jury reached its verdict, the court stated that appellant would remain shackled for the rendition of the verdict. It instructed appellant "to be seated the whole time the jury is in the room," with his hands and feet under the table. Appellant's counsel objected, and when the court asked him to explain the prejudice, counsel stated his concern that, if the jury was not unanimous in its verdict and had "to go back to deliberate," they already would have seen appellant in shackles. The prosecutor stated that he agreed with defense counsel "out of an abundance of caution."

The court acknowledged counsels' concern, but it stated that "there's going to be a security issue which I have to decide." After requesting court security to approach the bench,[18] the court confirmed that there was concern because a defendant facing "a homicide charge with a potential exposure" may create a security issue. The court decided to keep appellant's shackles on, but keep them hidden, explaining for the record that courtroom personnel "put [appellant's] suit coat . . . over the shackles or over the chains." It further stated that, "from my vantage point, I can't tell that he's chained [or] has any sort of restraints on." The court instructed that neither appellant nor counsel should stand for the reading of the verdict.

The jury then entered the courtroom, and the foreperson announced its verdict. Defense counsel requested a polling of the jury, and each of the jurors expressed their agreement with the verdict.

---

**18.** The record states that the court conferred with "The Clerk," but this appears to be a typographical error.

## B.

### Standard of Review

 "The decision as to the method and extent of courtroom security is left to the sound discretion of the trial judge." *Miles v. State*, 365 Md. 488, 570, 781 A.2d 787 (2001), *cert. denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002). *Accord Whittlesey v. State*, 340 Md. 30, 84, 665 A.2d 223 (1995), *cert. denied*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996) ("The trial judge has broad discretion in maintaining courtroom security."). As the Court of Appeals has explained, reviewing courts " 'uniformly rely upon an abuse of discretion standard for reviewing the action of trial judges in the matter of restraint.' " *Hunt v. State*, 321 Md. 387, 408, 583 A.2d 218 (1990) (quoting *Bowers v. State*, 306 Md. 120, 132, 507 A.2d 1072 (1986)), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). In exercising that discretion, however, the decision must be made by the judge personally; it may "not be delegated to courtroom security personnel." *Whittlesey*, 340 Md. at 84, 665 A.2d 223.

## C.

### Analysis

 Although a trial court has discretion in maintaining courtroom security, " 'as a general rule, an accused has a right to be tried [on the issue of guilty or not guilty] without being shackled, chained, bound, handcuffed, gagged, or otherwise physically restrained.' " *Lovell v. State*, 347 Md. 623, 639, 702 A.2d 261 (1997) (quoting S.R. SHAPIRO, ANNOTATION, *Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial*, 90 A.L.R.3d 17, 23 (1979)). This is because requiring a defendant to wear shackles that will be seen by a jury implicates the defendant's due process right to a fair trial. *See Deck v. Missouri*, 544 U.S. 622, 630, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."); *Whittlesey*, 340 Md. at 85, 665 A.2d 223 (the

use of "restraints might derogate the presumption of innocence in the eyes of the jury").

 "Shackling a defendant during the guilt/innocence phase of trial is inherently prejudicial because it highlights the 'need to separate a defendant from the community at large.' " *Hunt,* 321 Md. at 409, 583 A.2d 218 (quoting *Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). Accordingly, it is appropriate only when there is a compelling state interest. *Id.* "There are three essential state interests which may justify physically restraining a defendant: Preventing the defendant's escape, protecting those in the courtroom, and maintaining order in the courtroom." *Id.* at 410, 583 A.2d 218. "Unless one or more of these factors outweigh any prejudice to the defendant, physical restraint is inappropriate." *Id.*

 Before exercising its discretion to order a defendant to appear in restraints, the court must make " 'an individualized evaluation of both the need for shackling and the potential prejudice therefrom.' " *Miles,* 365 Md. at 569, 781 A.2d 787 (quoting *Whittlesey,* 340 Md. at 85, 665 A.2d 223). The trial judge must "ensure that the record reflects the reasons for the imposition of extraordinary security measures." *Whittlesey,* 340 Md. at 86, 665 A.2d 223.

Appellant contends that the circuit court erred in ordering him to remain shackled when the jury entered the courtroom to read its verdict without first making an individualized determination of the need for such a security measure. We agree, finding *Lovell,* 347 Md. at 642–48, 702 A.2d 261, instructive.

In *Lovell,* the Court of Appeals discussed circumstances that justified shackling at a capital sentencing hearing, such as multiple escape attempts, misconduct by the defendant at trial, and threats by the defendant. *Id.* In that case, however, the record was devoid of any indication that appellant had made any threats or posed an escape risk, and the circuit court's order that appellant wear restraints "rest[ed] entirely on his having committed murder, attempted murder, and

batteries while armed." *Id.* at 648, 702 A.2d 261. The Court of Appeals noted that: "Murder is intrinsically a most violent crime, but, if that alone justified shackling at a capital sentencing, then all murderers could be shackled when sentenced by a jury. That is not the way in which the Due Process Clause is applied[.]" *Id.* Accordingly, the Court held that the circuit court erred "in failing to base its decision to shackle on an individualized evaluation of whether the State interest in the protection of persons in the courtroom outweighed the prejudice to Lovell." *Id. Accord Duckett v. Godinez,* 67 F.3d 734, 748–49 (9th Cir.1995) (the trial court erred by requiring defendant to appear before capital sentencing jury in physical restraints where the court's "only stated reason for requiring [defendant] to appear in shackles during the penalty phase of the case was that he had just been convicted of two counts of murder"), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

That same analysis applies here. As in *Lovell,* the court did not express concern that appellant posed any particular threat, or was potentially at risk to escape. Rather, the court's rationale for ordering appellant to remain in shackles for the rendition of the verdict was that appellant was charged with murder, explicitly stating a concern "for any defendant, especially certainly . . . on a homicide charge with a potential exposure." Accordingly, the court abused its discretion in determining that requiring appellant to wear shackles for the rendition of the verdict was justified.

As the State notes, however, that is not the end of the inquiry. In reviewing a circuit court's order requiring a defendant to wear restraints, we must determine whether "the scene presented to jurors," and what they saw, "was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Bruce v. State,* 318 Md. 706, 721, 569 A.2d 1254 (1990) (quoting *Holbrook,* 475 U.S. at 572, 106 S.Ct. 1340).

As indicated, the general rule is that requiring a defendant to wear shackles that are visible to the jury during the guilt or innocence phase of trial is inherently prejudicial. *Deck*, 544 U.S. at 635, 125 S.Ct. 2007 (visible shackling is "inherently prejudicial"); *Hunt*, 321 Md. at 408–09, 583 A.2d 218 ("Placing a defendant under physical restraints such as leg irons at a guilt/innocence trial is an inherently prejudicial measure and requires a compelling state interest."). In this case, however, the shackling was not inherently prejudicial for two reasons. First, the shackling occurred after the jury had reached its verdict, albeit before it was announced. Second, the record does not reflect that the shackles were visible to the jury.

With respect to the timing of the shackling here, at least one court has held that, when the shackling occurs after the jury has reached its verdict, but before it is announced in open court, there is no presumption of prejudice. *State v. Clark*, 143 Wash.2d 731, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001). In *Clark*, the Washington Supreme Court explained that, in this situation, the "jury ha[s] already arrived at its verdict of guilt," and therefore, "the presumption of innocence was not at stake." *Id.* at 776, 24 P.3d 1006. Accordingly, in *Clark*, the court held that, although the court erred in ordering the defendant shackled without any individualized analysis of the need to restrain him, the error was harmless. *Id.*

██ That same analysis applies here. We hold that requiring a defendant to wear shackles during the rendering of the jury verdict, after the jury has reached a guilty verdict and the presumption of innocence has been overcome, is not inherently prejudicial. Unless there is some indication in the record that the shackling caused prejudice to the defendant, any error in requiring shackling at this point will be deemed harmless.[19]

19. One instance in which the record could show prejudice is the scenario voiced by defense counsel here, i.e., the jury advises that it is unable to reach a verdict and, after seeing the defendant in shackles, is sent back for further deliberations.

A second reason that the shackling was not inherently prejudicial in this case is that the court employed measures to hide the restraints from the view of the jury. Indeed, it specifically stated that court personnel put appellant's suit coat over the shackles, and the restraints were not visible from the court's vantage point. Thus, appellant's claim that his right to a presumption of innocence "was irrevocably damaged by his appearance in handcuffs and leg irons when the jurors entered the courtroom to render their verdict" is belied by the record.

In *Bruce*, 318 Md. at 715–16, 569 A.2d 1254 the Court of Appeals addressed extra security measures taken outside of the courtroom, including armed guards on the roof of the courthouse and extra metal detectors. The Court noted that counsel did not establish that the security measures were seen by the jury, and it stated that "[s]ecurity measures that are not observed . . . by the jury generally do not offend due process rights to a fair trial." *Id.* at 716–18, 569 A.2d 1254. Accordingly, the Court held that Bruce "failed to establish any unacceptable risk of prejudice from the limited description, on the record, of the security forces deployed in, around, and on top of the courthouse." *Id.* at 719–20, 569 A.2d 1254.

Other courts have applied this reasoning to the use of shackles, holding that, if shackles are hidden from the view of the jury, their use is not so "inherently prejudicial" to create a ground for reversal. For example, in *State v. Johnson*, 148 N.M. 50, 229 P.3d 523, 532–33 (2010), the Supreme Court of New Mexico noted that, in *Deck*, 544 U.S. at 634, 125 S.Ct. 2007, where the United States Supreme Court held that there was inherent prejudice due to visible shackling during the sentencing phase of his trial, the record was clear that the jury knew the defendant was shackled. In *Johnson*, 229 P.3d at 533, by contrast, there was "no indication that the jury saw the leg irons." Based on the lack of record evidence that the shackles were visible, the court stated that "the factors tending to show prejudice [were] not present." *Id.* The court held that, "where a defendant is restrained in a manner not visible to the jury, prejudice is not presumed," explaining that, "[a]s

the jury was not aware of Defendant's restraint, [his] presumption of innocence was not violated." *Id.*

Similarly, in *State v. Madsen,* 57 P.3d 1134 (Utah Ct.App. 2002), the Court of Appeals of Utah addressed the claim that requiring the defendant to stand trial in leg shackles was inherently prejudicial. In rejecting that claim, the court acknowledged that, although visible shackling is inherently prejudicial:

[I]f the jury cannot see the defendant's shackles, there can be no prejudice. *See, e.g., United States v. Mayes,* 158 F.3d 1215, 1226–27 (11th Cir.1998) ("The restraints in this case were not capable of affecting the jury's attitude in any way because the district court took great care to ensure that the jury never saw that the appellants were wearing leg irons."); *United States v. Brazel,* 102 F.3d 1120, 1158 (11th Cir.1997) ("Defendants, moreover, have not shown a realistic likelihood that they were prejudiced by what was done, the shackles having been screened from view.").

*Id.* at 1136 (quoting *Moon v. Head,* 285 F.3d 1301, 1317–18 (11th Cir.2002)).

The court in *Madsen* noted that the appellant had not alleged or shown support in the record that the shackles were visible to the jury, and the record suggested "the opposite: an apron was placed in front of Madsen's table to prevent the jury from viewing his leg irons. Moreover, the trial judge indicated that they were not visible and allowed Madsen to be seated prior to the jury's entrance." *Id.* at 1137. Accordingly, the court found no inherent prejudice from the use of the shackles. *Accord U.S. v. Baker,* 432 F.3d 1189, 1246 (11th Cir.2005) (where shackles "were not visible to the jury, and thus did not undermine the presumption of innocence in the jurors' minds such that they were 'inherently prejudicial' ") (quoting *Deck,* 544 U.S. at 634, 125 S.Ct. 2007); *People v. Letner,* 50 Cal.4th 99, 112 Cal.Rptr.3d 746, 235 P.3d 62, 107 (2010) (same), *cert. denied,* —— U.S. ——, 131 S.Ct. 2097, 179 L.Ed.2d 897 (2011); *State v. Wright,* 153 Idaho 478, 283 P.3d 795, 804 (Ct.App.2012) ("It is axiomatic, therefore, that before

a defendant may assert a violation of due process by the use of restraints, there must be evidence to show the jury was aware of the restraints and had an opportunity to draw a conclusion regarding the defendant's character."); *State v. Sparks,* 68 So.3d 435, 480 (La.2011) *cert. denied,* —— U.S. ——, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012) ("where the restraints are not visible to the jury, prejudice is not inherent" and, accordingly, where there was "no indication in the record before us that the jury ever saw or could see the shackles . . . the factors tending to show prejudice are not present"); *State v. Shoen,* 598 N.W.2d 370, 378 (Minn.1999) ("for erroneous restraints to have any prejudicial effect at all, the jury first must be aware that the defendant is wearing a restraint.").

Applying this reasoning to the present case, the shackling that occurred here was not inherently prejudicial. Indeed, the record shows no prejudice. The court made clear on the record that appellant's suit coat was pulled over the shackles, and the court instructed appellant not to stand to prevent the jury from seeing the leg shackles. The court specifically stated that appellant's restraints were not visible from the court's vantage point.[20]

Accordingly, although the trial court abused its discretion in failing to make a proper individualized determination that restraints were warranted, their use here was not inherently prejudicial, and appellant's claim that his right to a "presumption of innocence" was "irrevocably damaged by his appearance in handcuffs and leg irons" is without merit. Appellant states no claim for relief in this regard.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**20.** Appellant did not voice concern at that point that the jury might be able to see the shackles, nor did he seek a hearing after the verdict to determine whether any of the jurors saw the shackles.